# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-00235-COA

**TREVONTAE JOHNSON, MEEKCO JOHNSON**
**A/K/A MEEKO JOHNSON AND ISAAC**
**JOHNSON**

**APPELLANTS**

**v.**

**STATE OF MISSISSIPPI**

**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/09/2015 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: HUNTER NOLAN AIKENS |
| | ERNEST TUCKER GORE |
| | DAVID NEIL MCCARTY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | EACH APPELLANT WAS CONVICTED OF COUNT I, BURGLARY OF A DWELLING; COUNT II, ARMED ROBBERY; AND COUNT III, KIDNAPPING; AND SENTENCED TO CONSECUTIVE TERMS OF TWENTY-FIVE YEARS, THIRTY-EIGHT YEARS, AND THIRTY YEARS, RESPECTIVELY, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS. APPELLANT MEEKCO JOHNSON WAS ALSO CONVICTED OF COUNT IV, POSSESSION OF A FIREARM BY A CONVICTED FELON, AND SENTENCED TO AN ADDITIONAL CONSECUTIVE TERM OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS. |
| DISPOSITION: | AFFIRMED – 06/06/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., ISHEE AND FAIR, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1. Trevontae Johnson, Meekco[1] Johnson, and Isaac Johnson[2] appeal separate judgments of the Circuit Court of Washington County adjudicating each of them guilty of Count I, burglary of a dwelling; Count II, armed robbery; and Count III, kidnapping. Meekco also appeals his additional conviction of Count IV, possession of a firearm by a convicted felon. The circuit court sentenced Trevontae, Meekco, and Isaac to separate consecutive terms of twenty-five years for burglary, thirty-eight years for armed robbery, and thirty years for kidnapping. Meekco was also sentenced to an additional consecutive term of ten years for possession of a firearm by a convicted felon. All sentences for each Appellant were ordered to be served in the custody of the Mississippi Department of Corrections. Matthew Moore and Keagan Latham were indicted along with the Appellants, and Moore was tried with them. However, the jury found him not guilty of all counts. Latham was not tried with the Appellants, although he testified during their trial while charges against him were still pending.

¶2. On appeal, Trevontae maintains that the trial court erred in refusing to allow a police investigative report into evidence for the purpose of impeaching one of the State's witnesses. He also contends that the jury's verdict is against the overwhelming weight of the evidence.

---

[1] The record includes several spellings of Meekco's name; we will use "Meekco," as it is spelled in the indictment.

[2] For the sake of clarity, we will refer to the three defendants in this matter by their first names.

Meekco asserts that the trial court erred in denying a motion to suppress evidence and in placing limitations upon his right to present a defense.[3] He also asserts that he received ineffective assistance of counsel. Isaac asserts that the traffic stop of the motor vehicle in which he and Meekco were riding was illegal;[4] that the exclusion of his rebuttal witness destroyed his right to a defense; that the jury was not properly instructed regarding a key sentencing enhancement; and that the trial was inherently unfair due to the prosecutor's comments allegedly vouching for the truthfulness of one of the State's witnesses.

¶3.     We find no reversible error; therefore, we affirm the judgments of the circuit court.

FACTS

¶4.     During the early part of the night on April 8, 2013, police officers responded to a call from Wayne Barrett's residence in Greenville, Mississippi. Barrett, whose face was bruised and swollen, informed the police that his home had been burglarized and that he had been assaulted by three men. The incident began when a young man—whom Barrett recognized as a friend or relative of his former neighbors and later identified as fifteen-year-old Keagan Latham—knocked on Barrett's door and asked to use the phone. Barrett acquiesced; Latham

---

[3] For efficiency, we combine analysis of Meekco's argument with Trevontae's argument that the trial court erred in refusing to allow a police investigative report into evidence for the purpose of impeaching Latham, as the two are substantially similar. Meekco also argues that his right to present a defense was limited by the trial court's erroneous exclusion of one of the defense's rebuttal witnesses, Alex Johnson, who would have testified that Latham was in a gang. We combine this argument with Isaac's argument that the trial court erred in excluding one of the defense's rebuttal witnesses.

[4] For efficiency, we combine analysis of Isaac's argument with Meekco's argument that the trial court erred in denying his motion to suppress the evidence obtained from the allegedly unlawful traffic stop, as the two are substantially similar.

briefly used the phone and left. A few minutes later, Barrett heard another knock on the door. When he went to answer, three different male individuals, who were armed and whom Barrett did not recognize, forced their way into his residence. The men assaulted Barrett and forced him to accompany them from room to room as they stole two laptop computers, several guns, a bag of change, Barrett's wallet, and an iPhone. The men carried the items out of Barrett's home using a blue comforter, which they had removed from Barrett's bed.

¶5. Barrett identified Latham to police, but was unable to identify the other three men involved in the burglary. The following morning, on April 9, 2013, police took Latham's statement,[5] in which he implicated Trevontae, Meekco, Isaac, and Moore in the burglary and described their appearances. Latham also informed police that most of the stolen items had been taken to a certain residence on Ada Drive in Greenville. The police subsequently began preparing to obtain a search warrant for the Ada Drive residence.

¶6. Later that day, while the police were in the process of obtaining the search warrant, Sergeant Kenneth Redfield of the Greenville Police Department began conducting surveillance of the Ada Drive residence, with two fellow officers—Officer Andy Osbun and Officer Chris Surf—positioned nearby in their patrol cars. Sergeant Redfield testified at trial that he, along with the other officers involved in the matter, had been previously made aware of the suspects' names and general descriptions and that on the morning of April 9, 2013, he had received photos of the suspects from a group-text-message thread between members of

---

[5] Latham's statement was given to Officer Jeremy Arendale of the Greenville Police Department and was audio recorded.

4

the police department who were involved in this particular matter.[6] Around noon, Sergeant Redfield noticed two individuals, matching the description and photographs of two of the suspects, leaving the Ada Drive residence in a blue Chevrolet Impala. Officer Redfield transmitted this information to Officers Osbun and Surf and informed them as to the direction that the Impala was traveling. Shortly after, Officer Osbun spotted the Impala and conducted a traffic stop. Officer Osbun later testified that he did not observe the men in the Impala breaking any laws prior to the stop; rather, the reason for the stop was "to just identify the people" in the Impala. Officer Osbun also testified that he did not see photographs of the suspects until after the traffic stop was conducted. Officer Surf arrived shortly thereafter to assist Officer Osbun.

¶7.     Officer Osbun asked the driver for identification. The driver handed an identification card, not a driver's license, to Officer Osbun, identifying himself as Isaac Johnson. The passenger verbally identified himself as DeWayne Jordan, but Officer Osbun later learned that the passenger was Meekco Johnson. Officer Osbun instructed the two men to exit the vehicle, then asked for permission to search it. Officers Osbun and Surf both contended that Isaac consented to Officer Osbun's request to search. Officer Osbun searched the Impala and found two laptop computers in the trunk, which matched the description of those that had previously been stolen from Barrett's residence. As Officer Osbun was taking the computers to his patrol car, Isaac and Meekco jumped back into the Impala and drove away. Officers Osbun and Surf briefly pursued the Impala before losing sight of it. They reported the

---

[6] No evidence of the text-message-group thread or alleged photographs were produced at trial.

5

incident to Sergeant Redfield, who shortly thereafter saw the Impala pull behind some nearby apartments. Sergeant Redfield exited his vehicle and was walking behind the apartments, when suddenly he came upon Meekco and Isaac, standing by the Impala. Meekco and Isaac began running.

¶8. Shortly after this incident, the search warrant for the Ada Drive residence was finally obtained. Police went to the house, saw someone peeking through the blinds, commanded the person to exit the home, and then forcefully broke the door. Inside was a female and several children. The police searched the house and found multiple guns, all of which had been reported stolen from Barrett's home. The police also found a blue comforter matching the one that was stolen from Barrett's home.

¶9. Later that day, Barrett came to the police station and identified the recovered guns as his own. However, he was unable to identify the suspects in the photo lineups presented to him. Meekco, Trevontae, and Isaac were ultimately brought into police custody and charged.

¶10. Police submitted the guns obtained from the Ada Drive residence to the Mississippi Crime Laboratory for fingerprint analysis. Forensic scientist Mike Hood testified as an expert in latent fingerprint examination. Through Hood, the State introduced a forensic report indicating that a latent palm print was recovered from two of the guns obtained from the Ada Drive residence. The police submitted known fingerprints of Meekco, Isaac, Trevontae, Moore, and Latham. Through another forensic scientist, Jamie Bush, the State introduced a forensic report indicating that Isaac's known right palm print matched a latent print on one of the guns.

¶11. Meekco filed a pretrial motion to suppress the identification and evidence obtained

6

by Officer Osbun during the stop on the basis that the stop was illegally conducted because the officers had no reasonable suspicion to conduct it. The trial court held a hearing and denied the motion, finding that the stop was lawful.

¶12. At trial, Barrett acknowledged that he was unable to identify Meekco, Isaac, and Trevontae in photo lineups the day after the incident. However, Barrett identified the three defendants at trial. Latham also testified at trial and identified Trevontae, Isaac, and Meekco as those who were involved in the burglary.

¶13. Trevontae, Isaac, and Meekco were convicted of the burglary, armed robbery, and kidnapping of Barrett. They each filed post-trial motions, which the circuit denied, leading to this appeal.

## DISCUSSION

*1.    Whether the Trial Court Erred in Refusing to Allow into Evidence a Police Report for the Purpose of Impeaching Latham*

¶14. Trevontae argues that the trial court erred in refusing to allow a police report into evidence for the purpose of impeaching Latham, one of the State's witnesses in this case. Similarly, Meekco argues that "[t]he trial court violated his constitutional right to present a defense and to a fair trial by precluding the defense from cross-examining Latham about, and impeaching his testimony with, prior inconsistent statements in [Investigator Steven] O'Neal's report or Latham's recorded statement to Officer Arendale."

¶15. "The standard of review for the admission or exclusion of evidence is abuse of discretion." *Williams v. State*, 54 So. 3d 212, 213 (¶5) (Miss. 2011) (citation omitted). "The trial court's decision will stand unless the reviewing court concludes that the decision was

7

arbitrary and clearly erroneous, amounting to an abuse of discretion." *Id*. (citation omitted).

¶16.    At trial, Matthew Moore's defense counsel sought to impeach Latham using a police report that was prepared by Investigator O'Neal during the course of his investigation.  The report, which included a synopsis, prepared by Investigator O'Neal, of the audio-recorded interview between Officer Arendale and Latham, "provides a general summary[,] not a word for word transcription," of what Latham told Officer Arendale shortly after the alleged crime took place.  After much back and forth at trial, the final disposition of the issue was as follows:

> [THE COURT]: [Latham] is a party, so his statements are admissible; however, you would have to - - as far as this testimony is concerned, I don't think you can cross-examine him with the report of the investigator.  If you have something that he said that's in this statement, you can cross-examine him about that.  To put his statement in you would have to authenticate, so you would have to call a witness to do that.  And you can call this witness back in your case, if you want to do all that, but that's where we are right now.
>
> [DEFENSE COUNSEl]: . . . [Y]ou said I can't cross-examine him with the statements of the police - -
>
> [THE COURT]: I mean, you can't characterize it that he said what that other guy said he said.
>
> [DEFENSE COUNSEL]: But I can ask him[, "D]id you say["] - -
>
> [THE COURT]: Yeah, you can ask him if he said it.
>
> [DEFENSE COUNSEL]: Okay.
>
> * * * *
>
> [STATE]: Your Honor, so I understand as well . . . . The defense is allowed to say . . . ["D]id you say whatever off of this sheet, or did you say - - tell that to the police[,"] even though he can't possibly know what Investigator O'Neal, who prepared this document actually transcribed it as, because [Latham] has not seen this summary.

8

[THE COURT]: I think that's correct.

[STATE]: [Latham] hasn't seen the summary, so he can't possibly know how Investigator O'Neal put his words down. So - -

[THE COURT]: I think that's correct. The lawyer can ask him, ["D]id you say this[?"] If he says no, then he just says no. He can ask him what did he say.

[STATE]: Okay.

¶17. Trevontae maintains that the trial court's refusal to admit Investigator O'Neal's report left him "without a vital resource necessary to impeach Mr. Latham," resulting in irreversible harm to him. The trial judge was correct in his determination that Trevontae could cross-examine Latham about what Latham told Officer Arendale. The trial judge was also correct in ruling that Investigator O'Neal's synopsis of the interview between Latham and Officer Arendale could not be used to impeach Latham, because Latham was not interviewed by Investigator O'Neal. Further, the record shows that Latham was cross-examined extensively by four different lawyers, during which time he was questioned regarding the statements he made to Officer Arendale. We do not find any error in the trial judge's refusal to admit Investigator O'Neal's report, including the synopsis of Latham's interview with Officer Arendale. We also point out that Investigator O'Neal also testified, so he was subject to cross-examination about the contents of his report.

¶18. Similarly, Meekco maintains that the trial court's refusal to admit Investigator O'Neal's report limited his constitutional right to a defense, in that it "effectively insulated Latham from actual impeachment," and "prevented the defense from impeaching Latham after he denied making [an] inconsistent statement." Like a trial court's decision to admit

or exclude evidence, "[l]imitations placed on cross-examination are reviewed using an abuse-of-discretion standard." *Ervin v. State*, 136 So. 3d 1053, 1058 (¶13) (Miss. 2014) (citation omitted). "[O]ne accused of a crime has the right to broad and extensive cross-examination of the witnesses against him, and especially is this so with respect to the principal prosecution witness." *Suan v. State*, 511 So. 2d 144, 148 (Miss. 1987) (citations omitted). However, there was no basis for admitting the full investigatory report. As stated, Investigator O'Neal testified at trial, and defense counsel was given the opportunity to engage in extensive cross-examination of both Investigator O'Neal and Latham as to what Latham said during the interrogation, which was later summarized in Investigator O'Neal's report. Thus, we find that the circuit judge did not err in excluding the report.

2.    *Whether the Jury's Verdict Was Against the Overwhelming Weight of the Evidence*

¶19.    In Trevontae's motion for a new trial, he argued that the verdict in this case was against the overwhelming weight of the evidence. He makes the same argument here. An appellate court reviews the trial court's denial of a post-trial motion for abuse of discretion. *Flowers v. State*, 601 So. 2d 828, 833 (Miss. 1992) (citations omitted). "A motion for a new trial is discretionary with the trial judge and [an appellate court] will not order a new trial unless it is convinced that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*. (citations omitted).

¶20.    Trevontae maintains that there is no physical evidence linking him to the crime of which he was convicted. However, "the absence of physical evidence does not negate a

10

conviction where there is testimonial evidence." *Graham v. State*, 812 So. 2d 1150, 1153 (¶9) (Miss. Ct. App. 2002). "[T]he jury is the judge of the weight and credibility of testimony and is free to accept or reject all or some of the testimony given by each witness." *Meshell v. State*, 506 So. 2d 989, 992 (Miss. 1987). Here, Latham—an accomplice to the crime—testified that Trevontae was also involved in its commission. Barrett corroborated this testimony, also identifying Trevontae as one of the crime's perpetrators. The jury apparently believed both Latham's and Barrett's testimony. As the jury is free to reject or accept each witness's testimony, we will not now disturb its decision.

¶21. Trevontae contends that Barrett and Latham—who both identified Trevontae as one of the perpetrators of the burglary—presented unreliable testimony because Barrett could not previously identify Trevontae in a pretrial photo lineup or for up to six months after the crime took place. He also argues that Latham had an interest in the outcome of Trevontae's trial, which influenced his testimony. "[P]ersons may be found guilty on the uncorroborated testimony of a single witness." *Doby v. State*, 532 So. 2d 584, 591 (Miss. 1988). "[A] defendant may be lawfully convicted on the uncorroborated testimony of an accomplice"; however, "such testimony should be viewed with suspicion and must be reasonable and not improbable, self-contradictory or substantially impeached." *Fairchild v. State*, 459 So. 2d 793, 798 (Miss. 1984). "Only slight corroboration of an accomplice's testimony is required to sustain a conviction." *Osborne v. State*, 54 So. 3d 841, 847 (¶22) (Miss. 2011) (citation omitted). "The particular testimony needing corroboration is the portion tying the defendant to the crime." *Grossley v. State*, 127 So. 3d 1143, 1148 (¶14) (Miss. Ct. App. 2013) (citation omitted). Barrett's testimony corroborating Latham's testimony is sufficient  to sustain

11

Trevontae's conviction.

### 3. Whether the Traffic Stop Was Unlawful

¶22. Both Meekco and Isaac argue that the circuit court erred in denying Meekco's motion to suppress the evidence and identification obtained from the traffic stop of the blue Impala because the traffic stop was illegal; thus, the evidence and identification obtained therefrom should have been excluded as fruit of the poisonous tree.

¶23. Issues regarding the Fourth Amendment require a mixed standard of review. *Eaddy v. State*, 63 So. 3d 1209, 1212 (¶11) (Miss. 2011) (internal citation omitted). "Whether probable cause or reasonable suspicion exists is subject to a de novo review. But the Court limits the de novo review of the trial court's determination to historical facts reviewed under the substantial evidence and clearly erroneous standards." *Id*. (internal quotations and citation omitted). Additionally, "[i]n reviewing the denial of a motion to suppress, [an appellate court] must determine whether the trial court's findings, considering the totality of the circumstances, are supported by substantial credible evidence." *Moore v. State*, 933 So. 2d 910, 914 (¶9) (Miss. 2006) (citations omitted). "Where supported by substantial credible evidence, [an appellate court] shall not disturb those findings." *Id*. (citations omitted). Appellate courts "review[ ] the admission or exclusion of evidence for abuse of discretion." *Brown v. State*, 119 So. 3d 1079, 1082 (¶7) (Miss. Ct. App. 2013).

¶24. Both the United States Constitution and the Mississippi Constitution guarantee citizens the right to be secure from governmental intrusion via unreasonable searches and

seizures. U.S. Const. amend. IV; Miss. Const. art. 3, § 23.[7] The United States Supreme Court held in *Brendlin v. California*, 551 U.S. 249, 251 (2007), that when a vehicle is stopped pursuant to a police traffic stop, the vehicle is "seized" within the meaning of the Fourth Amendment, and both the driver and the passenger of the vehicle may challenge the constitutionality of the stop. While the Fourth Amendment generally requires that law enforcement procure a warrant based on probable cause prior to conducting a search or seizure in order for the search or seizure to be deemed "reasonable," there are several exceptions to the warrant requirement. *Moore*, 933 So. 2d at 916 (¶18). "Unless the State proves that a warrantless search comes within an exception, all evidence seized from the search is inadmissible." *Jackson v. State*, 418 So. 2d 827, 829 (Miss. 1982). There are two exceptions relevant to the matter at hand: the investigatory-stop exception and the consent exception.

¶25. The investigatory-stop exception applies where police officers "detain a person for a brief, investigatory stop . . . when the officers have 'reasonable suspicion, grounded in specific and articulable facts' that allows the officers to conclude the suspect is wanted in connection with criminal behavior." *Id*. (quoting *Walker v. State*, 881 So. 2d 820, 826 (¶10) (Miss. 2004)). *See also Terry v. Ohio*, 392 U.S. 1, 19 (1968). "Vehicles also may be the subject of an investigative stop." *Haddox v. State*, 636 So. 2d 1229, 1234 (Miss. 1994) (citation omitted). In determining whether "reasonable suspicion" exists such that an investigatory stop may be conducted, the court must consider whether, taking into account

_____

[7] As the language of these two provisions is nearly identical, we will refer to both in conjunction as the "Fourth Amendment" throughout the remainder of this opinion.

13

the totality of the circumstances, the detaining officers had a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). "Grounds for reasonable suspicion to make an investigatory stop generally come from two sources: either the officers' 'personal observation' or an informant's tip." *Eaddy*, 63 So. 3d at 1213 (¶15) (quoting *Williamson v. State*, 876 So. 2d 353, 355 (¶11) (Miss. 2004)) (citation omitted). "The officer's personal observation includes information from other law-enforcement personnel." *Id*; *see Dies v. State*, 926 So. 2d 910, 920 (¶29) (Miss. 2006) ("[R]easonable suspicion . . . can be transferred from officer to officer . . . ."). Further, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Mississippi cases have provided that "given reasonable circumstances an officer may stop and detain a person to resolve an ambiguous situation without having sufficient knowledge to justify an arrest." *Singletary v. State*, 318 So. 2d 873, 876 (Miss. 1975).

¶26.    With respect to the consent exception to the warrant requirement, "the United States Supreme Court has long recognized that a voluntary consent to a search eliminates an officer's need to obtain a search warrant." *Gazaway v. State*, 708 So. 2d 1385, 1388 (¶9) (Miss. Ct. App. 1998); *see Davis v. United States*, 328 U.S. 582, 593 (1946). Similarly, "Mississippi has long recognized that a defendant can waive his or her rights under the warrant requirement by consenting to a search." *Graves v. State*, 708 So. 2d 858, 863 (¶23) (Miss. 1997). However, the United States Supreme Court and the Mississippi Supreme Court differ in their opinions of "what constitutes a valid consent." *Gazaway*, 708 So. 2d at 1388

14

(¶9). The United States Supreme Court held in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), that "the pivotal determination of whether or not there was a valid consent rests on whether or not the consent was voluntary and not whether the party knew or was informed of a constitutional right which he then intentionally relinquished or abandoned." In contrast, the Mississippi Supreme Court held in *Penick v. State*, 440 So. 2d 547, 550 (Miss. 1983), that, for a consent to be valid, "it is necessary that the person searched be aware of his right to refuse." "[T]his knowledgeable waiver must be proved by the State beyond a reasonable doubt or by clear evidence." *Id*. "The State is not required to demonstrate knowledge"; rather, the "burden is on the defendant to show impaired consent or some diminished capacity." *Jones v. Miss. Dep't of Public Safety*, 607 So. 2d 23, 28 (Miss. 1991). "Whether a person voluntarily consented to the search is a 'question of fact to be determined by the total circumstances'":

> Those considerations include: whether the circumstances were coercive, occurred while in the custody of law enforcement or occurred in the course of a station house investigation. Other factors for consideration are the individual's maturity, impressionability, experience and education. Additionally, the court should consider whether the person was excited, under the influence of drugs or alcohol, or mentally incompetent.

*Robinson v. State*, 2 So. 3d 708, 714 (¶18) (Miss. Ct. App. 2008) (internal quotations and citations omitted). The United States Supreme Court has held that consent is not valid if it occurs subsequent to an illegal detainment because "the consent [is] tainted by the illegality and [is] ineffective to justify the search." *Florida v. Royer*, 460 U.S. 491, 507-08 (1983).

¶27. Here, both Isaac—the driver—and Meekco—the passenger—have standing to challenge the stop of the blue Impala under the Fourth Amendment. Meekco and Isaac first

15

assert that the stop was illegal because the police had no reasonable suspicion to conduct the stop; thus, it could not fall under the investigatory-stop exception to the Fourth Amendment warrant requirement. Second, Meekco and Isaac assert that Isaac's consent was invalid because it was obtained during the course of an illegal stop; therefore, it could not fall under the consent exception pursuant to the United States Supreme Court's decision in *Royer*. Meekco and Isaac argue that, as no other exception applies, their Fourth Amendment rights against unreasonable searches and seizures were violated, and the identification and evidence obtained therefrom should have been excluded.

¶28.  First, Meekco and Isaac maintain that the police lacked reasonable suspicion to conduct the stop at the time that Officer Osbun stopped the blue Impala. Meekco and Isaac argue that the stop was improper because the officers only had vague descriptions of the suspects, which did not amount to reasonable suspicion to stop the car and ascertain the identities of those in the car. Further, neither Latham, Barrett, nor any other officer testified to having any knowledge of a blue Impala in connection with the burglary of Barrett's residence. The first time a blue Impala was referenced in connection with this crime was when Sergeant Redfield saw the car in the driveway at the Ada Drive residence. Meekco and Isaac maintain that these facts do not indicate that the officers had reasonable suspicion to stop the car.

¶29.  In contrast, the State maintains that the officers had reasonable suspicion to conduct the stop based not only on the descriptions of the subjects provided by Latham, but also on the photographs of the suspects that they had received prior to conducting surveillance on the Ada Drive residence. At the hearing on Meekco's motion to suppress the evidence, Sergeant

16

Redfield testified to the following:

[STATE]: [You and Officers Osbun and Surf] were briefed about what you were asked to do and kind of given a summary of what had happened, correct?

[SERGEANT REDFIELD]: Yes.

[STATE]: And I believe that y'all were told from other investigators on the case that a robbery had taken place the night before and that some firearms and computers and items of that nature had been taken from the home, correct?

[REDFIELD]: That's correct.

[STATE]: And that a defendant in that case had given a statement saying they had taken these items to that home on Ada Street.

[REDFIELD]: Yes.

[STATE]: And that's why you were asked to watch that house in anticipation of the search warrant to see if anybody took anything, correct?

[REDFIELD]: That's correct.

[STATE]: And y'all were given general descriptions of the suspects; is that right?

[REDFIELD]: Yes.

* * * *

[STATE]: These two black males, they fit the description that you saw leaving that [sic] and getting into that Impala, they fit the general description that you had been given, correct? - -

[REDFIELD]: Yes.

[STATE]: - - by criminal investigations, and at that point you notified the other officers, correct? [T]hat you saw this vehicle leaving.

[REDFIELD]: Yes. I notified by radio Investigator Surf and Investigator Osbun that one [of] the vehicles were leaving [sic] which was the blue Chevy Impala and in what direction travel was going [sic].

17

* * * *

[DEFENSE COUNSEL]: The time that you were there [on surveillance], what specific description did you have of the suspects, the persons?

[REDFIELD]: I know on[e] of with - - it's a all black male subject was looking for [sic]. One of them had dreds. Slender build on one. It wasn't - - that's about all I had at the time.

[DEFENSE]: So the only description you had was black and dreds; is that correct?

[REDFIELD]: One [of] the men had black, had dreds in his hair, yes.

[DEFENSE]: You didn't have any other identifying characteristics?

[REDFIELD]: No.

[DEFENSE]: What about clothing? Did you have any specific kind of clothing they would be wearing or anything like that?

[REDFIELD]: No.

[DEFENSE]: And did you know the person that you were looking for? You know who it was at the time?

[REDFIELD]: I [had] just seen photos. I didn't know them personally. I didn't know them personally, no.

[DEFENSE]: Back on April 9th you'd seen photos of the persons?

[REDFIELD]: No, before - - when it happened, they sent out group texts and stuff, so we kind of know what's going on with CID.

[DEFENSE]: But to be clear, no photos on April 9th?

[REDFIELD]: I'm sorry. Say again.

[DEFENSE]: I'm trying to understand. No - - the only description you're relying on was that a black male and they had dreds, right [sic]?

[REDFIELD]: Not all of them. One [of] the suspects [was] supposed to have dreds on them. Now, as far as how they face [sic] looked, I remember how

18

they - - we had photos through a text showing - -

[DEFENSE]: When did you get the photos?

[REDFIELD]: They came in I believe some time that morning when they send - - do the group text.

[DEFENSE]: So you saw photos that morning?

[REDFIELD]: Yeah.

[DEFENSE]: Of who? Who was the photos supposed to be of?

[REDFIELD]: Of the guys that supposedly had committed the armed robbery and the home invasion over there.

Additionally, Officer Arendale described how the officers who would be surveiling the Ada Drive residence were given descriptions of the suspects in the burglary:

[STATE]: And so the . . . officers [who would be surveiling], I guess, they were informed of what they were doing, correct?

[OFFICER ARENDALE]: Yes, sir.

[STATE]: And they were informed about the events leading up to this.

[ARENDALE]: Yes, sir. I notified them.

[STATE]: And why they were given descriptions of the items that were taken in case, I guess, they saw somebody taking those items out, right?

[ARENDALE]: That's correct.

[STATE]: And they were given descriptions, I guess, of the individuals that y'all believed to have been involved in this.

[ARENDALE]: That's correct.

[STATE]: Based on Keagan Latham's statement.

[ARENDALE]: Yes, sir.

19

Officer Osbun, who actually conducted the traffic stop, also testified as to his knowledge of

the suspects at the time he pulled them over:

> [STATE]: You had occasion to become involved at the request of the detective division, CID, with a surveillance or with a traffic stop; is that right?
>
> [OFFICER OSBUN]: Right.
>
> [STATE]: And you had received information that this vehicle was leaving the home that was, I guess, the target of surveillance in anticipation of a search warrant?
>
> [OSBUN]: That's correct?
>
> [STATE]: Correct?
>
> [OSBUN]: Right.
>
> * * * *
>
> [STATE]: And in discussing the case with members of CID, all of you received information, I guess, that what? There had been a robbery the night before.
>
> [OSBUN]: Right.
>
> [STATE]: And y'all were given details about that robbery.
>
> [OSBUN]: Right.
>
> [STATE]: And y'all were given general descriptions of the suspects.
>
> [OSBUN]: Right.
>
> [STATE]: And I believe that y'all were given the names of some of them; is that right?
>
> [OSBUN]: What's that.
>
> [STATE]: Y'all had been given some of the names of the suspects, persons of interest, right?

[OSBUN]: I believe we did, yes.

[STATE]: When you saw that blue Impala that matched up with the description of the vehicle that you had been given by Redfield, correct [sic]?

[OSBUN]: Right.

[STATE]: And so when you made the stop, you were making the stop to investigate based off the knowledge you had of the incident the night before, as well as the knowledge of Investigator Redfield; is that correct?

[OSBUN]: Yes.

* * * *

[STATE]: And y'all had been given, I guess, a general description of why y'all were surveiling that home.

[OSBUN]: Right.

[STATE]: And y'all had been told that there had been some sort of incident the night before and that a suspect had given information that they had taken some of the items that were taken in the robbery to that home, correct?

[OSBUN]: That's right.

[STATE]: And y'all were also told, given general descriptions of the individuals in that home, correct?

[OSBUN]: Right.

[STATE]: That were involved in the robbery.

[OSBUN]: Correct.

[STATE]: And you were, I guess became involved actually when Investigator Redfield, now Sergeant Redfield told you that there was a vehicle leaving the home, correct?

[OSBUN]: That's right.

[STATE]: Tell us what happened after that when you made the stop on the vehicle.

21

> [OSBUN]: He advised that an Impala was leaving occupied by two black males, and my only job that day was kind of to be away from the house but just get intel from Sergeant Redfield. Said Impala was leaving. I was a few blocks away, noticed an Impala and I did the stop.

Later, Osbun testified that his stop was not based on any illegal conduct by the Impala; rather, it was

> [a]n investigator (sic) stop. It wasn't a traffic stop. It was just - - you know, if it could - - any Impala I believe I - - it was a blue, something like that, any Impala I would have stopped just for investigative purposes. And he said it was two black males. Two black males were in this Impala, and I did the stop.

The State argues that, given the descriptions of the suspects and the fact that Sergeant Redfield—who observed the men leaving the house—had seen photographs of the suspects, the police officers were confronted with an ambiguous situation and the investigatory stop was therefore proper to dispel that ambiguity. Additionally, the State argues that even if the officers' initial reasons for the stop were improper, the doctrine of inevitable discovery would have come into play because Isaac—the driver of the blue Impala—presented an identification card, not a driver's license, to police. The State argues that Isaac's failure to produce a driver's license after operating a vehicle in Mississippi is a crime for which he could have been arrested. The vehicle could have subsequently been impounded, and an inventory search could have been conducted. The laptops which were discovered in the trunk would have been found pursuant to such an inventory search.

¶30. Officer Osbun stopped Isaac and Meekco based on information that he received from Sergeant Redfield. Sergeant Redfield, while conducting surveillance of the Ada Drive residence, saw two men exit the house and get into the blue Impala. The two men's

22

appearances fit the description of two of the suspects that Latham had previously provided to police. As personal observation may be transmitted from officer to officer, we fail to see how this does not constitute reasonable suspicion for an investigatory stop. Further, Sergeant Redfield testified that images of the suspects had been circulated through a group text message among those involved in the investigation of this particular matter. Thus, the stop was not illegal, and the trial court did not err in denying Meekco's motion to suppress.

¶31. Meekco and Isaac also maintain that the evidence should have been suppressed because it was not obtained under the consent exception to the Fourth Amendment: because the initial traffic stop constituted an illegal detainment, the search of the car was not justified on the basis of Isaac's subsequently obtained consent. In support of this argument, Meekco cites *Royer*, 460 U.S. at 507-08, in which the Supreme Court found that where a defendant had given consent to the search of his luggage while he was being illegally detained, "the consent was tainted by the illegality and was ineffective to justify the search." In response, the State contends that even if the stop was illegal and Isaac's consent was, as a result, illegally obtained, the circuit judge's failure to suppress the evidence found in the trunk of the car was harmless error because the evidence ultimately collected from the Ada Drive residence—out of which Isaac and Meekco exited—combined with the damning information provided by Latham to the police overwhelmingly indicated their guilt beyond a reasonable doubt.

¶32. We agree with the State. "The U.S. Supreme Court has repeatedly recognized that the commission of a constitutional error at trial does not entitle a defendant to automatic reversal. Instead, most constitutional errors can be harmless." *Brown v. State*, 995 So. 2d 698, 704

23

(¶24) (Miss. 2008) (internal quotations omitted) (quoting *Washington v. Recuenco*, 548 U.S. 212 (2006)). "The basic test for harmless error in the federal constitutional realm is . . . whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id*. (quoting *Thomas v. State*, 711 So. 2d 867, 872 (¶25) (Miss. 1998) (citing *Chapman v. California*, 386 U.S. 18 (1967))). "Nonstructural, constitutional errors in the face of 'overwhelming evidence of guilt' are harmless errors." *Id*. (quoting *Thomas*, 711 So. 2d at 872 (¶25)). Upon finally obtaining the search warrant to the Ada Drive residence and conducting their search, police officers found all but one of the guns that Barrett had reported stolen.[8] The police also found a blue comforter matching the one that was used to carry the guns out of Barrett's home. The police submitted the guns to the Mississippi Crime Laboratory for fingerprint analysis and uncovered a latent palm print from two of the guns. The police submitted known fingerprints of Meekco, Isaac, Trevontae, Moore, and Latham. At trial, the State entered a forensic science report into evidence indicating that Isaac's fingerprints matched the latent palm print found on one of the guns. This evidence, combined with the testimony from Latham indicating Meekco's and Isaac's involvement, along with the fact that police officers witnessed Isaac and Meekco exiting the house in which the guns were found, is overwhelmingly indicative of their guilt, such that any error derived from an illegal stop or illegally obtained consent is harmless beyond a reasonable doubt.

4.      *Whether Meekco Received Ineffective Assistance of Counsel*

---

[8] One of the guns—a .22-caliber rifle—was never located.

¶33. Meekco argues that his trial counsel was ineffective. "In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that his attorney's performance was deficient and that the deficiency was so substantial as to deprive the defendant of a fair trial"; in so doing, appellate courts

> look at the totality of the circumstances to determine whether counsel's efforts were both deficient and prejudicial. There is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Only where it is reasonably probable that, but for the attorney's errors, the outcome would have been different, will we find that counsel's performance was deficient.

*Dartez v. State,* 177 So. 3d 420, 423 (¶19) (Miss. 2015) (citations omitted). Furthermore, "counsel's choice[s] of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy." *Bigner v. State*, 822 So. 2d 342, 346-47 (¶24) (Miss. Ct. App. 2002).

¶34. Specifically, Meekco argues that his trial counsel was ineffective for: (1) failing to raise a hearsay or confrontation objection to the admissibility of Hood's and Bush's forensic fingerprint reports; (2) failing to obtain a ruling on the defense's motion to suppress Barrett's in-court identification and failing to object to Barrett's in-court identification; (3) failing to object to the prosecutor's impermissible statements during closing argument; and (4) failing to move for a severance or a mistrial.

¶35. Generally, appellate courts will not hear claims of ineffective assistance of counsel on direct appeal, unless "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Grady*

25

*v. State*, 190 So. 3d 870, 871 (¶8) (Miss. Ct. App. 2015). As neither is the case here, we decline to address this issue and dismiss Meekco's ineffective-assistance-of-counsel claim without prejudice, so that he may seek permission from the Mississippi Supreme Court to raise this issue in a post-conviction-relief petition, if he so chooses.

5.    *Whether the Trial Court Erred in Excluding One of the Defense's Rebuttal Witnesses*

¶36.    Isaac and Meekco argue that the trial court erred when it refused to allow one of the defense's rebuttal witnesses—Alex Johnson—to impeach Latham by testifying that Latham told Alex of his involvement in the "Chicago Gang," on the basis that Alex was present in the courtroom during Latham's testimony, despite Rule 615 of the Mississippi Rules of Evidence having been invoked. Rule 615 governs witness sequestration in Mississippi, and provides that, "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." "The rule applies to rebuttal witnesses as well as witnesses who have testified, or could have testified, on the case-in-chief." *Finley v. State*, 725 So. 2d 226, 233 (¶21) (Miss. 1998) (citation omitted). When a party "invokes the rule," the trial court *must* apply it. *Avery v. State*, 119 So. 3d 317, 320 (¶9) (Miss. 2013). "When a witness has violated the rule, the trial court has discretion as to the proper remedy." *White v. State*, 127 So. 3d 170, 173 (¶10) (Miss. 2013). "Appropriate remedies for a sequestration violation include prospectively excluding the witness where prejudice will otherwise ensue; striking the testimony where connivance gave rise to the testimony; [or] striking the testimony where the prejudice arose." *Kiker v. State*, 919 So. 2d 190, 194 (¶9) (Miss. Ct. App. 2005) (citation omitted). "The most appropriate remedy is allowing the other party to

subject the witness to a 'full-bore cross-examination' on the facts of the rule violation." *Id*. (citation omitted). "Failure to comply with a sequestration order does not automatically render the witness's testimony inadmissible." *Clark v. State*, 127 So. 3d 292, 297 (¶14) (Miss. Ct. App. 2013) (citation omitted). "Exclusion of the testimony is a 'serious sanction,' and appropriate only where probable prejudice would result to the other party." *Id*. (quoting *Harris v. State*, 937 So. 2d 474, 479 (¶16) (Miss. Ct. App. 2006)). "The appellate court is limited to an abuse-of-discretion standard when reviewing an alleged sequestration violation." *White*, 127 So. 3d at 173 (¶10) (citation omitted). "Reversal is not justified unless there is a showing of prejudice sufficient to constitute abuse of discretion on the part of the trial judge in not ordering a mistrial or not excluding testimony." *Whittington v. State*, 748 So. 2d 716, 719 (¶19) (Miss. 1999).

¶37.    At trial, the State elicited testimony from Investigator O'Neal, Officer Joseph Horn, and Barrett, who all testified that the three men who robbed Barrett stated that they were in "Chicago Gang." Latham, during his testimony, denied being in a gang. After Latham's testimony, the defense sought to call Alex to testify. Alex told the trial judge—out of the presence of the jury—that he would testify that Latham had personally told Alex of his involvement in a gang. Further, Alex sought to testify that he was familiar with gang signs and symbols, and that Latham had displayed such signs and symbols through pictures on social media. The trial court denied the defense's request, maintaining that the State had invoked Rule 615, and Alex was therefore precluded from testifying because he had been present in the courtroom during Latham's testimony.

¶38.    Isaac and Meekco argue that the circuit judge erred in refusing to allow Alex to testify

as to the fact that Latham had told Alex of his involvement in a gang, thereby impeaching Latham's previous statement to the contrary. Isaac and Meekco assert that their Sixth Amendment rights were violated as a result, because they were precluded from fully presenting a defense. In support of this argument, Isaac and Meekco cite *White*, where the supreme court found that it was an abuse of discretion for the trial court to exclude the testimony of a witness for no reason other than a violation of the sequestration rule. *White*, 127 So. 3d at 176 (¶18). In response, the State maintains that the trail judge did not err in excluding Alex's testimony and, even if he did, the error was harmless in light of the overwhelming evidence of Isaac's and Meekco's guilt.

¶39.   We agree with Isaac and Meekco that the circuit judge erred in refusing to allow Alex's testimony that Latham had previously told Alex of Latham's involvement in the "Chicago Gang," as there is no evidence to suggest that probable prejudice would have resulted to the State in allowing Alex to testify as to that matter only. Therefore, even though Alex violated Rule 615, the circuit court should have allowed the defense to impeach Latham's testimony that Latham was not a member of the "Chicago Gang." However, Isaac and Meekco have failed to show that they suffered sufficient prejudice to compel a finding that the trial court's ruling amounts to an abuse of discretion. In the absence of such prejudice, the trial court's error was harmless. As previously stated, "most constitutional errors can be harmless." *Brown*, 995 So. 2d at 704 (¶24) (citations omitted). "The basic test for harmless error in the federal constitutional realm is . . . whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id*. (citations omitted). "In conducting harmless-error analysis, [appellate courts have] the

power and duty to review the record de novo to determine the error's effect." *Avery*, 119 So. 3d at 320 (¶10) (citations omitted).

¶40. We can say without a doubt that Alex's testimony would have had only a negligible impact on the final result of the trial had he been allowed to give the impeaching testimony. At the time Isaac and Meekco sought to call Alex to the witness stand, Latham had already testified that he lied to his mother and the bus driver about his plans on the evening of the robbery, thus putting his credibility squarely before the jury. In spite of Latham's admissions that he had lied, the jury chose to believe his testimony regarding all three defendants' involvement in the burglary. Allowing Alex's testimony to impeach Latham's testimony regarding the peripheral "Chicago Gang" issue would not have dismantled his credibility to the extent that the outcome of the trial would have been different, as neither Isaac's nor Meekco's guilt turned on whether Latham was a member of the "Chicago Gang." Therefore, this issue is without merit.

      6.     *Whether the Jury Was Properly Instructed Regarding a Sentence Enhancement for Burglary*

¶41. Isaac argues that he, Trevontae, and Meekco were charged with an "enhanced" form of burglary, which raised the minimum sentence, yet the jury was not properly instructed regarding that enhancement. "Jury instructions are generally within the discretion of the trial court and the settled standard of review is abuse of discretion." *Bailey v. State*, 78 So. 3d 308, 215 (¶20) (Miss. 2012) (citation omitted). "When read together, if the jury instructions fairly state the law of the case and create no injustice, then no reversible error will be found." *Id*. ( citations omitted). "[A]n offended party's failure to object to jury instructions at trial

29

procedurally bars the issue on appeal." *Jones v. State*, 776 So. 2d 643, 653 (¶35) (Miss. 2000) (citation omitted). However, a "trial court's failure to instruct the jury properly on the essential elements of the crime of burglary *requires* reversal." *Bolton v. State*, 113 So. 3d 542, 544 (¶4) (Miss. 2013) (citation omitted; emphasis in original).

¶42. Isaac, Trevontae, and Meekco were charged under Mississippi Code Annotated section 97-17-23(1) (Rev. 2014), which prohibits a person from "breaking and entering the dwelling house . . . of another." Additionally, Isaac, Trevontae, and Meekco were charged with doing the above "under circumstances likely to terrorize any person who is actually occupying the house at the time of the criminal invasion of the premises." Miss. Code Ann. § 97-17-23(2). While the standard definition of burglary carries a minimum penalty of three years in the custody of MDOC and maximum penalty of twenty-five years, the "enhanced" form of burglary regarding an intent to terrorize carries a minimum penalty of ten years in the custody of MDOC and maximum penalty of twenty-five years. Miss. Code Ann. § 97-17-23(1)-(2). Isaac maintains that the jury was not properly instructed as to what "likely to terrorize" means. The State argues that the phrase "likely to terrorize" is self-explanatory and needs no definition. We agree.

> 7. *Whether the Prosecutor Made Improper Comments During Closing Argument*

¶43. Isaac argues that the trial court erred in allowing the prosecutor to make improper comments during its closing argument. This Court in *Stevenson v. State*, 156 So. 3d 927, 929-30 (¶¶11-13) (Miss. Ct. App. 2015), made the following remarks regarding prosecutorial misconduct in closing arguments:

30

While attorneys are allowed wide latitude in presenting their cases to a jury, "prosecutors are not permitted to use tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Sheppard v. State*, 777 So. 2d 659, 661 (¶7) (Miss. 2000) (citing *Hiter v. State*, 660 So. 2d 961, 966 (Miss. 1995)). The standard of review for "lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Slaughter v. State*, 815 So. 2d 1122, 1130 (¶45) (Miss. 2002) (citing *Sheppard*, 777 So. 2d at 660 (¶7)).

To determine whether a prosecutor's closing remarks were reversible error, this Court applies the two-part test adopted in *Spicer v. State*, 921 So. 2d 292, 318 (¶55) (Miss. 2006) (modified by *Brown v. State*, 986 So. 2d 270, 286 (¶16) (Miss. 2008), and partially abrogated by *O'Connor v. State*, 120 So. 3d 390, 400-01 (¶¶28-29) (Miss. 2013)). First, we review the remarks to determine if they were improper. *Id*. If so, then we analyze whether the remarks prejudicially affected the rights of the accused. *Id*. "It must be clear beyond a reasonable doubt that absent the prosecutor's comments, the jury could have found the defendant guilty." *Id*.

Before applying this test, we must determine if defense counsel objected to the statement or if defense counsel invited the statement in light of the surrounding circumstances. *Id*. at 317-18 (¶¶52-53). "[I]f no contemporaneous objection is made, the error, if any, is waived." *Slaughter*, 815 So. 2d at 1130-31 (¶47) (quoting *Walker v. State*, 671 So. 2d 581, 597 (Miss. 1995)).

Furthermore, "a prosecutor is prohibited from stating his personal opinion as to the veracity of a witness." *Palmer v. State*, 878 So. 2d 1009, 1012 (¶9) (Miss. Ct. App. 2004) (citations omitted). "Typically, this type of prohibited statement occurs when a prosecutor attempts to vouch for or bolster a State witness by commenting in closing argument that the witness was telling the truth." *Stokes v. State*, 141 So. 3d 421, 427 (¶23) (Miss. Ct. App. 2013) (citation omitted).

¶44. An appellate court may review an issue notwithstanding a procedural bar if the court finds that there is plain error. *McGee v. State*, 953 So. 2d 211, 215 (¶8) (Miss. 2007). "A

review under the plain error doctrine is necessary when a party's fundamental rights are affected, and the error results in a manifest miscarriage of justice." *Id*. (citation omitted). "To determine if plain error has occurred, we must determine 'if the trial court has deviated from a legal rule, whether that error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial.'" *Id*. (quoting *Cox v. State*, 793 So. 2d 591, 597 (¶22) (Miss. 2001)). However, the plain-error exception to the contemporaneous-objection rule is to be used sparingly, "solely in those circumstances in which a miscarriage of justice would otherwise result." *Stokes*, 141 So. 3d at 427-28 (¶26) (quoting *United States v. Frady*, 456 U.S. 152 (1982)).

¶45. The State argues that Isaac is procedurally barred from raising the issue of prosecutorial misconduct because there was no objection made, contemporaneously or otherwise, to the allegedly prejudicial remarks. In response, Isaac argues that the prosecutor's misconduct constitutes plain error, in that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

¶46. During closing arguments, the prosecutor stated:

> They wanted to say that [Latham] is a bad kid, that [Latham] got off the bus early, that [Latham] lied to the bus driver, said he was going to Greenville High, that [Latham] lied to his mom and said, "Mom, I'm not really hanging out with those guys.["] [Latham] is a 15-year-old boy. That's what 15-year-olds do. The simple fact of the matter is, ladies and gentlemen, [Latham] didn't take an oath to that bus driver to tell the truth, the whole truth, and nothing but the truth. [Latham] didn't take an oath to his mother to tell the truth, the whole truth, and nothing but the truth. But, ladies and gentlemen, you saw [Latham] stand here and swear to tell the truth, the whole truth, and nothing but the truth. And you know who he told that truth, the whole truth, and nothing but the truth to? Each and every one of you.

32

Additionally, Isaac contends that the prosecutor wrongfully emphasized that Latham could be trusted because he came forward, and that the prosecutor wrongfully emphasized that Latham voluntarily came forward with his statement to police.

¶47. Suffice it to say that, based on the arguments made by the defense, the prosecutor's comments were a proper response to those arguments. This issue is without merit.

¶48. In summary, we find no reversible error. Even if the traffic top were illegal—and we have not found that it was—and the evidence obtained as a result of it tainted as fruit of the poisonous tree, there was still sufficient untainted evidence to sustain the jury's verdict. The evidence taken from the trunk of the blue Impala was only part of the damning evidence against the Appellants. No claim is made that the evidence removed from the Ada Street address pursuant to the search warrant was in any way inadmissible. And, as discussed, the circuit court's error in refusing to allow impeaching testimony from Alex did not deny Appellants a fair trial or have the probable effect of impacting the verdict. Accordingly, we affirm the judgment of the circuit court.

¶49. **THE SEPARATE JUDGMENTS OF THE WASHINGTON COUNTY CIRCUIT COURT OF CONVICTION OF EACH APPELLANT OF COUNT I, BURGLARY OF A DWELLING; COUNT II, ARMED ROBBERY; AND COUNT III, KIDNAPPING, AND CONSECUTIVE SENTENCES OF TWENTY-FIVE YEARS, THIRTY-EIGHT YEARS, AND THIRTY YEARS, RESPECTIVELY; AND THE ADDITIONAL CONVICTION OF APPELLANT MEEKCO JOHNSON OF COUNT IV, POSSESSION OF A FIREARM BY A CONVICTED FELON, AND CONSECUTIVE SENTENCE OF TEN YEARS, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, ARE AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO WASHINGTON COUNTY.**

**LEE, C.J., GRIFFIS, P.J., ISHEE, CARLTON, GREENLEE AND WESTBROOKS, JJ., CONCUR. BARNES, FAIR AND WILSON, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**