CHANDLER, J.,
for the Court.
¶ 1. Antonio Harris was found guilty of manslaughter after a trial in the Circuit Court of Leflore County and sentenced to twenty years in the custody of the Mississippi Department of Corrections. Harris appeals, arguing that (1) the trial court abused its discretion in allowing the testimony of Ashley Smith; (2) the trial court erroneously denied his motion for a JNOV; and (3) the trial court erroneously denied his motion for a new trial.
FACTS
¶ 2. Harris was romantically involved with Julisa Smith, with whom he had several children. Harris was aware that Smith had another paramour, Ronald Dates. On the evening of April 23, 2003, Harris shot and killed Dates during an encounter at Smith’s apartment in Greenwood, Mississippi. At his murder trial on July 13-15, 2004, Harris asserted that he had killed Dates in self-defense. However, testimony from Smith and her daughter contradicted Harris’s assertion.
¶ 3. Smith testified that she witnessed part of the fatal encounter. Smith related that, on the evening of April 23, 2003, she put her children to bed at her second-floor apartment. Dates called and said he was coming over. Smith heard a knock at the door and unlocked it, believing that the visitor was Dates. However, Harris entered. In the living room, Harris began berating Smith about not returning his phone calls. After several minutes, Dates entered, carrying a package of food. Without speaking to Harris, Dates walked through the living room, into the kitchen, and placed the package on the counter near the microwave. While Harris and Smith were talking, Dates briefly walked into the living room and back into the kitchen. Then, Harris pulled a gun from underneath his shirt and walked over to Dates. Harris’s back was facing Smith, and Smith heard three gunshots. In the midst of the shots, she observed Harris and Dates struggling with their hands on each other’s arms. In the struggle, Dates was trying to take the gun. Smith saw Dates begin to fall. Then, Dates told Smith to run. Smith left the apartment and ran down the staircase outside. She heard two or three more shots and yelled to her neighbors to call the police. Smith testified that, before Harris shot Dates, Dates had not spoken to Harris or done anything else to provoke Harris’s ire.
¶4. Smith’s eleven-year-old daughter, Ashley Smith, testified that she also witnessed the shooting. According to Ashley, after her mother put her to bed, she crept out to the hallway and lay down on the floor. Ashley stated that, from her vantage point, she could see parts of the living room and the kitchen. She saw Harris arrive and begin talking to Smith about not returning his calls. Then, Ashley saw *476 Dates come in and place his food next to the microwave. Ashley saw Harris walk up behind Dates, pull out a gun, and shoot him. After the first shot, Dates yelled for Smith to leave and tried to take the gun from Harris, but Harris shot him again. Then, Dates dragged himself to the hallway. He saw Ashley. Harris grabbed Dates’s feet and dragged him outside. Ashley hid inside a hall closet. While in the closet, Ashley heard the thumping sound of Harris dragging Dates down the stairs. Then, Ashley closed the front door and called the police. She heard a noise, looked out the window, and saw Dates dragging himself up the stairs to the neighbors’ door and begin knocking on the door. Ashley opened her front door and Dates told her to go back inside. Ashley stated that she heard over seven gunshots in all. She admitted that she had told the police that Harris shot Dates again at the bottom of the stairs. Both Smith and Harris testified that they did not see Ashley in the hallway.
¶ 5. Shanina Johnson testified that she lived on the second floor across from Smith’s apartment. Johnson stated that, on April 23, 2003, she heard gunshots. When the shooting stopped she looked out of the window and saw Smith running around on the first floor yelling “call the police.” She heard someone knocking on the door, opened it, and saw Dates lying on the doorstep. She saw Ashley come outside and then go back into the apartment.
¶ 6. When the police arrived, Dates was alive and was lying at the top of the staircase outside Smith’s apartment. Dates died shortly after being taken to the hospital. An autopsy confirmed that he received seven .380 gunshot wounds, including three fatal wounds to the chest. The state pathologist, Dr. Stephen Hayne, testified that the wounds were inflicted in a close-range conflict and demonstrated differing bullet trajectories, indicative of a struggle between Dates and the shooter. Dr. Hayne testified that the three fatal wounds caused massive internal bleeding. Dr. Hayne also testified that Dates has abrasions on his knees and back that could have been from being dragged down the stairs or from traveling up the stairs. The police found no evidence that Dates had been shot at the bottom of the stairs; the .380 pistol held seven rounds and all seven hulls were found inside the apartment.
¶ 7. Harris testified. He admitted to having shot Dates, but stated that he did so while in fear for his life. Harris related several prior encounters with Dates that contributed to his fear. When Harris visited Smith’s apartment one night in October 2002, Dates charged out of a bedroom, placed Harris in a choke hold, and threw him down. Dates held Harris in the choke hold until the police arrived. Harris testified that while in the choke hold his vision was going in and out, he urinated and defecated on himself, spit up blood, and thought he was going to die. Harris stated that the animus between himself and Dates had existed since 1991, when Dates swerved his car at Harris as Harris walked down the street. In 1992, Dates spoke threateningly to Harris at a club. In 1995, Harris was talking to people at a club when Dates approached him from behind, knocked him down, and attempted to beat him up but was stopped by other patrons. In 1998, Harris came out of a club and Dates was waiting beside his car; Harris felt threatened and walked in the other direction. Harris stated that Dates was stronger than he. Harris was approximately five feet, eight inches tall and Dates was approximately six feet tall. Several witnesses testified that Dates had a reputation in the community as a violent, intimidating person.
*477 ¶ 8. Harris testified that, after the October 2002 choking incident, he brought his .380 pistol for protection from Dates every time he visited Smith. Harris testified that, on April 23, 2003, he visited Smith to find out why he had not been able to reach her by phone for the past few days. Harris stated that he was worried about his children and thought Ashley had called him from school that day. Harris stated that Dates arrived and placed his food in the kitchen while Harris and Smith talked. While Harris’s back was facing Dates, Harris saw Smith’s eyes widen. He turned around and Dates was coming at him. Dates tried to grab Harris’s head, but Harris ducked and they began tussling in the kitchen area. Harris, thinking Dates was trying to put him in a deadly choke hold, grabbed his gun and started firing. Dates fell to the floor. Harris tried to leave, but Dates “popped up on one knee” and renewed the attack. Harris fired the remaining rounds, thinking the shots had missed Dates because Dates kept fighting. Harris stated that his intent was not to kill Dates, but to repel him. Then, Harris backed out of the apartment with the gun pointed at Dates. Dates followed him. Harris backed down the stairs and Dates lunged at him; Harris fired the gun again but was out of bullets. Dates fell down on the stairs and grabbed Harris’s leg. Harris hit Dates on the head twice with the gun and Dates released Harris’s leg. Harris departed and saw Dates walk back up the stairs, cursing.
¶ 9. After the shooting, Harris fled to Jackson, Mississippi. The next day, his sister picked him up and he turned himself in to the authorities. Harris left the .380 pistol in his sister’s car and she turned it over to the police. It was stipulated that the pistol was the one used in the shooting.
¶ 10. The jury found Harris guilty of manslaughter.
LAW AND ANALYSIS
I. WHETHER THE TRIAL COURT ERRONEOUSLY ALLOWED THE TESTIMONY OF ASHLEY SMITH OYER HARRIS’S OBJECTION.
¶ 11. Harris argues that the trial court abused its discretion in failing to exclude Ashley’s testimony due to a violation Mississippi Rule of Evidence 615, the witness sequestration rule. Mississippi Rule of Evidence 615 provides:
At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose •presence is shown by a party to be essential to the presentation of his cause.
Rule 615 is frequently termed “the Rule.” Brown v. State, 682 So.2d 340, 347 (Miss.1996).
¶ 12. The Rule 615 problem came to light during a break in the testimony of Ashley’s mother, Julisa Smith. Smith was under oath and the Rule had been invoked. Ashley was yet to testify. Defense counsel advised the court that, during the break, he had observed Smith and Ashley speaking together in a conference room outside the courtroom. The prosecutor also saw Smith and Ashley together. The court took an overnight recess and instructed Smith that she could talk to her daughter, but not about the case. Smith’s testimony resumed the following day. Before Ashley’s testimony, the court conducted witness voir dire of Ashley.
*478 ¶ 13. Upon questioning by the court, Ashley indicated that she knew the difference between the truth and a lie. But during subsequent questioning by both the court and defense counsel, Ashley denied that her mother was in the conference room with her the previous day. She further denied having talked to Smith about Smith’s testimony. Then, the prosecutor questioned Ashley and the following colloquy occurred:
Q. Ashley, do you remember yesterday when you were down there in the room?
A. Yes.
Q. And remember when I came down there?
A. Yes.
Q. Was another person in the room when I came down there?
A. Yeah.
Q. Who was that?
A. My mama.
Q. And what was she doing when she was out there?
A. Nothing, but looking out the window.
Q. Okay. And did she do something else while she was down there? Because you reached for it to take something out of her hand. What did you take out of her hand?
A. Her purse.
Q. Okay. And why were you trying to take her purse out of her hand?
A. Playing with stuff she got in her purse.
Q. And I asked her for some gum. Do you remember that?
A. Yes.
Q. Okay. And she had something in her hand. Do you remember what she had in her hand?
A. ■ Yeah.
Q. What?
A. A card.
Q. Okay. And what else did she have?
A. That’s it.
Q. Does your mother smoke?
A. Yeah.
Q, Did she smoke that day?
A. No.
Q. Okay. And during the time that you were down there with her, did you talk to her at all while you were down there?
A. Yeah.
Q. And when y’all were down there talking, did y’all talk at all about what had happened on the night that Ronald was killed?
A. No.
Q. And did you know whether your mother had testified at that point? Did you know if your mother had come in the courtroom?
A. Yeah.
Q. She had come in the courtroom?
A. Uh-huh.
Q. And did she say anything to you about what she had said in the courtroom?
A. No.
Q. Okay. Did you ask her what happened when she was in the courtroom?
A. No.
Q. Do you know when your mother was in the courtroom, did anybody ask her any questions or anything?
A. Yeah.
Q. And how do you know that?
A. Because that’s what lawyers do.
Q. Okay. Did she tell you what questions people asked her?
A. No.
¶ 14. After the voir dire, defense counsel moved to exclude Ashley’s testimony. Defense counsel argued that he could not *479 meaningfully cross-examine Ashley since she had lied to the court and to defense counsel about having been in the room with her mother. Then, the following occurred:
BY THE COURT: I think, counsel, I don’t know if it’s because she’s the prosecutor, or she’s a woman, or what it may be, but there may be another reason just other than what you think.
BY MR. ROYALS, Well, whatever the reason is, though, it’s obvious that she’s not going to even admit anything, or answer truthfully in any way, to what we ask her whether I’m a man — because I’m a man or not, a defense attorney, or whatever, and that means that we are going to put a witness on the stand who has demonstrated to the court and to all counsel that she will not answer truthfully.
BY THE COURT: Counsel.
BY MR. ROYALS: Yes, sir.
BY THE COURT: We’ve already been over that she’s afraid to be here.
BY MR. ROYALS: Yes, sir.
BY THE COURT: We had to put a screen up for her to be here. She is 11 years old.
BY MR. ROYALS: Yes, sir.
BY THE COURT: She’s in the middle of a courtroom full of people that she’s never seen before. She’s around adults she’s never seen before.
BY MR. ROYALS: Yes, sir.
BY THE COURT: I would imagine, I would imagine, she’s apprehensive.
BY MR. ROYALS: I would, too.
BY THE COURT: So here’s what we’re going to do.
BY MR. ROYALS: Yes, sir.
BY THE COURT: I’m going to find that there has not been any prejudice under 615. I’m going to let her testify. We’re going to see how it goes, and I’m going to allow you as much as you can on cross-examination. We may have to get into any other statement she may have made. I don’t know. I don’t know if she’s made any other statements. I have no idea.
¶ 15. On appeal, Harris argues that trial court erred in failing to exclude Ashley’s testimony. In the seminal case applying Rule 615, Douglas v. State, 525 So.2d 1312 (Miss.1988), the court observed that witness sequestration is a matter of right except for the three categories of witnesses listed in the Rule. Rule 615 has a twofold purpose; it “exercises a restraint on witnesses ‘tailoring’ their testimony to that of earlier witnesses and it aids in detecting testimony that is less than candid.” Id. at 1316. In Douglas, the court held that, where the Rule had been invoked at the beginning of the trial, it was error under Rule 615 for a sheriff to remain in the courtroom during a trial and to then testify in rebuttal. Id.
¶ 16. The court discussed remedies for violations of the Rule. A witness’s failure to comply with a sequestration order does not automatically render -the witness’s testimony inadmissible. Rather, the decision to exclude the witness’s testimony rests within the trial court’s sound discretion. Id. at 1317. Exclusion of the testimony is a “serious sanction,” and appropriate only where probable prejudice would result to the other party. Id. The more appropriate sanction is to allow the other party “full bore” cross-examination of the witness on the facts of the Rule violation. Id. If prejudice is only a possibility, the trial court may instruct the jury that it should consider the Rule violation in evaluating the credibility of the witness. Id. On appeal, the failure of the trial judge to order a mistrial or to exclude testimony “will not justify reversal ... absent a *480 showing of prejudice sufficient to constitute abuse of discretion.” Id. at 1318.
¶ 17. In Douglas, one Rule 615 violation at issue involved the courtroom presence of a rebuttal witness after the invocation of the Rule. Douglas also discussed a situation akin to the one we face today, in which prospective witness Ashley was not in the courtroom during other witness testimony, but in which Smith and Ashley were closeted together during a break in Smith’s testimony. In Douglas, three rebuttal witnesses were not in the courtroom, but Douglas argued that the district attorney had gone into the witness room and related trial testimony to the three witnesses. Id. On cross-examination, all three witnesses testified that the district attorney had told them what Douglas and his witnesses had testified about. Id. Upon Douglas’s objection, the State contended that it had merely prepped the witnesses and had not told them what to say. Id.
¶ 18. The court stated that the purpose of the Rule is to ensure that witness testimony will not be affected by that of other witnesses, and that the Rule is indirectly circumvented when someone relates trial testimony to witnesses outside of the courtroom. Id. at 1319. On the other hand, the court observed, attorneys need to consult with their witnesses in preparation. for their testimony. Id. The court stated that, when the Rule has been indirectly circumvented, the trial court should undertake the same determinations and considerations as it does for a direct violation of the Rule. Id. Further, the court warned, while prepping witnesses, attorneys must be careful not to indicate specifically what other witnesses have testified about. Id. Notably, the court held that, because Douglas’s attorney cross-examined each witness. as to the facts of the violation of the Rule, the issue of the credibility of the witnesses as to their rebuttal testimony was before the jury and there was insufficient prejudice to Douglas to mandate reversal. Id.
¶ 19. In this case, the purported Rule violation was not that an attorney had informed Ashley about Smith’s testimony, but that Smith might have informed Ashley about it when she was closeted with Ashley during a break in the testimony. We find that the trial judge did not abuse his discretion in deciding not to exclude Ashley’s testimony, but instead to allow Harris to conduct full-bore cross-examination of Ashley. There was no showing that Smith had actually told Ashley anything about her testimony. Harris argues that Ashley’s untruthfulness on questioning by defense counsel rendered effective cross-examination by defense counsel an impossibility. However, during cross-examination, Harris questioned Ashley about the meeting with Smith and Ashley’s untruthfulness about the meeting during the witness voir dire. Thus, the jury was squarely faced with both the issue of Ashley’s truthfulness about not having discussed Smith’s testimony in the conference room and the issue of Ashley’s having lied to the court and defense counsel about having met Smith in the conference room. As in Douglas, this information equipped the jury to effectively evaluate Ashley’s credibility. Id.
¶ 20. Harris also argues that he suffered probable prejudice because it was manifest from Ashley’s initial untruthfulness about the meeting with Smith that Ashley also lied when she denied that Smith told her about Smith’s testimony. We find that the trial court, having observed Ashley’s demeanor on the witness stand, was better placed to assess the import of Ashley’s untruthfulness during voir dire. As illustrated by the trial transcript, the court reasoned that a motivation such *481 as fear of the courtroom setting might initially have induced the eleven-year-old Ashley to lie. Ashley subsequently admitted having met with her mother when questioned by the State. These facts evince no more than a possibility of prejudice that was met by Harris’s full-bore cross-examination of Ashley. We find that Harris has not shown prejudice sufficient to render the trial court’s ruling an abuse of discretion.
II. WHETHER THE TRIAL COURT ERRED IN DENYING HARRIS’S MOTION FOR A DIRECTED VERDICT, REFUSING TO GRANT HARRIS’S REQUEST FOR A PEREMPTORY INSTRUCTION, AND DENYING HARRIS’S MOTION FOR A JNOV.
¶ 21. A motion for a directed verdict or a JNOV or a request for a peremptory instruction attacks the legal sufficiency of the evidence. McClain v. State, 625 So.2d 774, 778 (Miss.1993). Each of these challenges requires the appellate court to consider the propriety of the trial court’s ruling based upon the evidence before the court when made. Id. Thus, we “properly review[ ] the ruling on the last occasion the challenge was made in the trial court.” Id. Harris last challenged the sufficiency of the evidence with his motion for a JNOV.
¶22. In reviewing the denial of motion for a JNOV, this Court views the evidence in the light most favorable to the verdict. Bush v. State, 895 So.2d 836, 843(1116) (Miss.2005). We will affirm if any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. “Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury.” Harveston v. State, 493 So.2d 365, 370 (Miss.1986).
¶ 23. The jury found that Harris’s conduct met the elements of heat of passion manslaughter. Mississippi Code Annotated section 97-3-35 (Rev.2000) provides, “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.” The jury was also instructed on the elements of self-defense. Mississippi Code Annotated section 97-3-15(l)(f) (Rev.2000) states that the killing of a human being is justifiable “[wjhen committed in the lawful defense of one’s own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished.” When self-defense is raised, the State bears the burden of proving beyond a reasonable doubt that the defendant was not acting in necessary self-defense. Heidel v. State, 587 So.2d 835, 843 (Miss.1991).
¶ 24. Harris argues that there was insufficient evidence adduced at the trial to permit a reasonable jury to find that his slaying of Dates was “not in necessary self-defense” as required by section 97-3-35. In furtherance of this argument, Harris discusses the evidence supporting a finding of self-defense. Harris points to his own testimony that Dates was the aggressor, that Dates tried to put Harris in a choke hold, and that he shot Dates while in fear for his life. Harris argues his fear was reasonable based upon his past encounter with Dates when Dates placed Harris in a choke hold, causing Harris to spit up blood, to lose bowel and bladder control, and to think he was going to die.
¶25. Harris further argues that the physical evidence supported his version of the encounter. It was established that *482 seven hulls from Harris’s .380 pistol came to rest on the floor in a pattern largely consistent with Harris’s description of his scuffle with Dates, and that any inconsistencies could have been explained by the hulls having been kicked across the floor during the scuffle. Dr. Hayne testified that, after the gunshot wounds were inflicted, Dates would have been able to carry on “purposeful activity” like walking and running and could have survived for ten to twenty minutes. This evidence supported Harris’s testimony that Dates continued attacking him after having been shot and that Harris therefore thought his gunshots -had missed Dates. Finally, Harris argues that Smith was an incredible witness due to her several convictions for credit card fraud and that Ashley was incredible due to her lies during the witness voir dire. Harris also established that Ashley had made prior inconsistent statements to the police and during an interview with defense counsel.
¶ 26. Viewing the evidence in the light most favorable to the verdict, we find that the evidence was sufficient to enable a reasonable jury to reject Harris’s self-defense theory and to find Harris guilty of manslaughter. Smith and Ashley both related that they saw Harris approach Dates, draw his gun, and begin shooting Dates. Smith and Ashley testified that Harris, not Dates, was the aggressor. While the physical evidence was somewhat consistent with Harris’s version of events, it was also consistent with the testimony of Smith and Ashley, creating a fact question for the jury. And, the credibility of Smith and Ashley was thoroughly explored by both Harris and the State. The weight to assign their testimony was a matter properly resolved by the jury. Harveston, 493 So.2d at 370. The jury was entitled to accept the testimony of Smith and Ashley and to reject that of Harris.
¶ 27. We further observe that, from the fact that Harris shot Dates seven times, a reasonable jury could have found that Harris initially shot Dates in self-defense but at some point his continued shooting became unnecessary. See Carter v. State, 858 So.2d 212, 215(¶ 7) (Miss.Ct.App.2003) (This Court stated that the reasonableness of a defendant’s actions is usually for the fact-finder “because the assessments of the level and imminence of the threat to the defendant’s physical well-being and the appropriateness of the defendant’s level of response to the perceived danger require interpretation and analysis of the peculiar set of facts presented in a particular case.... ”). There was sufficient evidence to support the verdict.
III. WHETHER THE TRIAL COURT ERRED IN DENYING HARRIS’S MOTION FOR A NEW TRIAL.
¶ 28. The weight of the evidence is challenged by a motion for a new trial. In reviewing the denial of a motion for a new trial, we “must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial.” Collins v. State, 757 So.2d 335, 337(¶ 5) (Miss.Ct.App.2000). We give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence. Id. We will reverse only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that allowing it to stand would sanction an unconscionable injustice. Id.
¶ 29. Harris makes essentially the same arguments to support this assignment of error as those supporting his assertion that the evidence was insufficient to support the verdict. Considering the evidence discussed above and.giving the State the benefit of all reasonable inferences to be drawn from the evidence, we find that the *483 jury’s returning a manslaughter verdict was a reasonable conclusion. We find that the verdict was not against the overwhelming weight of the evidence and that Harris was not entitled to a new trial.
¶ 30. THE JUDGMENT OF THE CIRCUIT COURT OF LEFLORE COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LEFLORE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.