## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2017-KA-01661-COA

**CHRISTIAN ALLEN A/K/A TREY PULLEY**                 **APPELLANT**
**A/K/A CHRISTIAN TREYVAUGHN ALLEN**

**v.**

**STATE OF MISSISSIPPI**                                       **APPELLEE**

DATE OF JUDGMENT:          08/04/2017
TRIAL JUDGE:          HON. ALBERT B. SMITH III
COURT FROM WHICH APPEALED:          COAHOMA COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          BRANDON ISAAC DORSEY
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
         BY: KAYLYN HAVRILLA McCLINTON
DISTRICT ATTORNEY:          BRENDA FAY MITCHELL
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:          AFFIRMED - 04/14/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE J. WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.

### J. WILSON, P.J., FOR THE COURT:

¶1. Following a jury trial, Christian Allen was convicted of first-degree murder and two counts of aggravated assault. The court sentenced Allen to life plus a total of fifty years in the custody of the Department of Corrections. On appeal, Allen argues that the trial judge erred by refusing three of his proposed jury instructions, that the evidence is insufficient to support his convictions, and that the jury's verdict is against the overwhelming weight of the evidence. We find no error and affirm Allen's convictions and sentences.

### FACTS AND PROCEDURAL HISTORY

¶2. On December 23, 2014, Maple Pace finished her shift at Walmart in Clarksdale and

went home. Her nephew Joshua Melton and his friend Roosevelt Holmes were at her house when she arrived. Melton wanted to buy a Christmas gift for his girlfriend, so Pace, Melton, and Holmes drove back to Walmart and went to the jewelry department. As they were looking at jewelry, Christian Allen and James Tompkins approached Melton. Allen and Melton started arguing. Pace told the jewelry sales associate to call security. Pace then told the men to stop fighting because she was afraid she would get fired. Pace also called her sister Felice (Melton's mother) and told her that Allen and Tompkins had followed them into Walmart and were trying to start a fight. Pace then left the group at the jewelry counter and went shopping elsewhere in the store. When Pace later tried to leave the store, a security guard stopped her and took her to the store manager's office for questioning. Security footage of the argument at the jewelry counter was admitted into evidence at trial.

¶3.    After Felice received Pace's call, she drove to Walmart to try to keep her son from fighting. She went to the jewelry department, but Pace and the others were no longer there. Felice eventually found Melton and Holmes and told them to go to the tire department at the other end of the store, where she would pick them up and take them home. As Felice walked back to her car, she called a friend who was a Clarksdale police officer and told him that some men were trying to fight her son at Walmart. Before she reached her car, she heard gunshots. She did not see the shooting but saw a light-colored SUV driving away from the scene. She followed the SUV for a distance before returning to Walmart. Upon returning, she learned that her son had been shot, and she went directly to the hospital.

¶4.    Melton testified that he, Pace, and Holmes were at the jewelry counter to buy his

2

girlfriend a Christmas gift when Allen and Tompkins approached and tried to start a fight. Melton said that he and Holmes walked away and continued shopping without incident. As he and Holmes left the store, they encountered four of their friends: Brandon Smith, Martavious Berryhill, Deandra Cockerham, and Anthony Giles (hereinafter, collectively, "Melton's group"). Melton told them that Allen and his friends were trying to "jump" him. Smith told Melton that he had seen Allen and his friends.

¶5.     Melton's group started walking toward Pace's car in the parking lot, which was near row 6. Before they reached Pace's car, Allen, Tompkins, James Evans, and Connell Gray (hereinafter, collectively, "Allen's group") pulled up in a truck and hopped out. Allen said to Melton, "You've got your n*****s, and I've got my n*****s." Melton interpreted this to mean that Allen still wanted to fight him. Allen and Melton both moved between the parked cars and faced each other with a car between them. Melton then took off his jacket and necklace and handed them to Holmes. The various members of the two groups were all standing relatively near one another.

¶6.     Melton then saw Allen raise a gun and begin shooting in Smith's direction. Smith was shot, and Allen continued to fire. Allen then pointed the gun at Melton, and Melton took off running. Melton was shot in the neck as he ran. Melton testified that he saw only Allen shooting and that Smith did not have a gun or any other weapon.

¶7.     Holmes testified that before he and Melton left Walmart together, he had walked outside to find Allen and "see if [he] could resolve the problem" between Melton and Allen. Holmes then went back in the store to find Melton, and they left together. Otherwise,

3

Holmes's testimony was similar to Melton with respect to the events leading up to the parking-lot confrontation between Melton's group and Allen's group. Prior to the shooting, Holmes heard Smith ask Cockerham "where his gun was." Allen then began shooting at Smith. Holmes testified that Smith was unarmed, but Cockerham, who was standing behind Smith, did have a gun. When Allen began shooting at Smith, Holmes ran. Allen continued firing, and Holmes was shot in the back.

¶8. Cockerham testified similarly regarding the events leading up to the confrontation in the parking lot. Cockerham admitted that he had a gun with him, but he testified that he never pulled out his gun and that no one else had a gun but Allen.

¶9. Law enforcement officers arrived soon after the shooting and secured rows 6 and 7 of the parking lot with yellow crime-scene tape. Smith's body was slumped over a vehicle parked in row 6. Investigator Charles Sledge photographed the scene and collected shell casings, projectiles, and bullet fragments. Photos of the scene were given to the jury. Sledge collected six casings from row 6, all within five to six feet of Smith's body. Sledge found some projectiles and bullet fragments on row 7.

¶10. Sledge sent the evidence he collected to the Mississippi Crime Lab, and ballistics expert Starks Hathcock testified at trial. The evidence from the crime scene included three projectiles from a .40-caliber weapon, six casings from a .40-caliber weapon, and one projectile from a .38-caliber weapon. In addition, a .40-caliber projectile was retrieved from Smith's body during the autopsy. Hathcock could not identify some of the fragments that Sledge collected. Hathcock opined that the three .40-caliber projectiles from the crime scene

4

were all fired from the same gun. Hathcock said it would not be possible for the .38-caliber projectile to have come from a .40-caliber gun.

¶11. Sledge testified that he saw Melton and Holmes at the emergency room. Melton had been shot in his neck, and Holmes had been shot in the back. Sledge photographed their injuries. Dr. James Woytash, a pathologist with the State Medical Examiner's Office, performed an autopsy on Smith. Smith had been shot a total of six times: twice in the back of his head, three times in his back, and once on his side. Dr. Woytash could not determine the distance from which Smith was shot. Dr. Woytash determined the manner of death to be homicide and the cause of death to be multiple gunshot wounds.

¶12. The murder weapon was never recovered. A few hours after the shooting, a law enforcement officer performed a gunshot residue test on Giles's hands. Giles had been held and monitored to preserve any possible residue. However, tests for gunshot residue on Giles's hands were negative. Law enforcement also bagged and taped Smith's hands before he was taken to the morgue in order to preserve any possible residue. No gunshot residue was identified on Smith's hands. Cockerham was not tested for gunshot residue.

¶13. Tompkins's mother, Tracy Jones, testified for the defense. Jones testified that Tompkins was driving her gray Chevrolet Suburban on the night of the shooting. Jones found out that the police were looking for Tompkins, and she met Tompkins and persuaded him to turn himself in to the police. Jones noticed that there appeared to be new bullet holes in her Suburban. She drove it home and parked it in her yard, thinking that the police would want to see it. However, Jones said that no one ever contacted her about the vehicle or the

5

supposed bullet holes. She admitted that she did not know whether bullets actually caused the damage to her Suburban.

¶14. Allen and Tompkins were jointly indicted for first-degree murder and two counts of aggravated assault. Allen and Tompkins were tried jointly once. During their joint trial, the circuit court granted Tompkins's motion for a directed verdict on the three counts in the indictment. As to Tompkins, the case was submitted to the jury only on the lesser offense of accessory after the fact. As to Allen, the case was submitted to the jury on the three counts in the indictment. However, the jury was unable to reach a verdict on any of the charges, and the court declared a mistrial.

¶15. Allen was retried without Tompkins. The jury at Allen's second trial found him guilty of first-degree murder and both counts of aggravated assault. The court sentenced Allen to life imprisonment for murder and two consecutive terms of twenty-five years for the aggravated assault convictions.[1] Allen filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and then appealed.

## ANALYSIS

¶16. On appeal, Allen argues that the trial judge erroneously refused his proposed jury instructions on the issues of self-defense and accident. He also argues that there was not sufficient evidence to convict him on any of the three counts and that the jury's verdict is against the overwhelming weight of the evidence. We find no error and affirm.

---

[1] The maximum sentence for aggravated assault is twenty years, Miss. Code Ann. § 97-3-7(2)(a) (Rev. 2014), but Allen was sentenced to an additional five years on each count because he used a firearm in the commission of the offenses. *See id.* § 97-37-37(1) (Rev. 2014).

## I.     Jury Instructions

¶17.   "[T]he standard of review for the denial of jury instructions is abuse of discretion." *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). "While a defendant is entitled to jury instructions that present his theory of the case," a proposed instruction should be refused if it "lacks foundation in the evidence presented." *Cooper v. State*, 230 So. 3d 1071, 1077 (¶19) (Miss. Ct. App. 2017). The jury instructions that are actually given must be read as a whole. *Milano v. State*, 790 So. 2d 179, 184 (¶14) (Miss. 2001). "[I]f all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." *Id.*

### A.     Refused Instruction D-3

¶18.   At trial, Allen requested the following jury instruction (D-3) on self-defense:

> The Court instructs the jury that to make a killing justifiable on the grounds of self defense, the danger to [Allen] must either be actual, present or urgent, or [Allen] must have reasonable grounds to believe that [Smith] intended to kill him . . . or to cause him . . . some great bodily harm, and in addition to this, [Allen] must have reasonable grounds to believe that there is imminent danger of such act being accomplished.

Allen argued that he was entitled to a self-defense instruction because there was testimony that Smith asked "where his gun was" moments before he was shot. Allen argued that the jury could infer that Smith's question had caused Allen to fear for his life. The State responded that the instruction was improper because there was no testimony that Allen feared for his life or that Smith ever had a gun. The trial judge agreed and observed that Smith's question implied only that he did *not* have a gun and was unarmed when he was shot. Nonetheless, the trial judge gave a self-defense instruction after noting that "not in necessary

7

self-defense" was an element of the first-degree murder charge. The judge simply chose to give instruction C-21 instead of D-3. Instruction C-21 read:

> The Defendant in this case claims self-defense. The Court instructs the jury that to make a killing justifiable on the ground of self-defense, the danger to the Defendant must either be actual, present, and urgent or the Defendant must have reasonable grounds to apprehend a design on the part of the victim to kill him or do some great bodily harm; and in addition to this, he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the Jury to determine the reasonableness of the grounds upon which the Defendant acts.

¶19. On appeal, Allen fails to acknowledge that C-21 was given at trial or explain how it differs from D-3. As can be seen, there is no material difference between C-21 and D-3. Instruction C-21 fairly stated the applicable law, and the trial judge did not abuse his discretion by refusing instruction D-3 in favor of another similarly worded instruction. This issue is totally without merit.

### B. Refused Instruction D-4

¶20. Allen also requested an instruction on the excuse of "accident,"[2] which the trial judge also refused. Allen's proposed instruction D-4 read as follows:

> The Court instructs the jury that the killing of any human being by the act of another shall be excusable when committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation. In this case, if you find from the evidence, or have a reasonable doubt therefrom, that [Allen], in the heat of passion, upon any sudden and sufficient provocation by [Smith], [Allen], accidentally shot [Smith] and/or through misfortune killed [Smith], then it is your sworn duty to acquit [Allen].

The State argued that there was no basis for the instruction because there was no evidence that Allen shot anyone by accident. The judge agreed and refused the instruction.

---

[2] *See* Miss. Code Ann. § 97-3-17 (Rev. 2014).

8

¶21.　The judge did not err by refusing the instruction.　On appeal, Allen offers no explanation for this instruction, and he identifies no evidence in the record that the killing was an "accident."　Indeed, the fact that Allen shot Smith six times and then shot two other men, all as they tried to run away, belies any suggestion of "accident."　Jury instructions must be based on actual *evidence* presented at trial, not unfounded speculation.　*Nelson v. State*, 284 So. 3d 711, 718 (¶26) (Miss. 2019).　The trial judge correctly refused this instruction because "[t]here simply was no evidence" to support it.　*Id.*

### C.　Refused Instruction D-5

¶22.　Allen also requested what is sometimes referred to as an "after-developed facts" instruction.　Proposed instruction D-5 stated:

> The Court instructs the jury that you are not to judge the actions of [Allen] in the cool, calm light of after-developed facts, but instead you are to judge [Allen's] actions in the light of the circumstances confronting [Allen] at that time, as you believe from the evidence that those circumstances reasonably appeared to [Allen] on that occasion; and if you believe that under those circumstances it reasonably appeared to [Allen], at the instant he took up a weapon, that the design on the part of [Smith] . . . to kill him (i.e. [Allen]) or to do him (i.e. [Allen]) some great personal injury, and that there reasonably appeared to [Allen] to be imminent danger of such designs being accomplished, then [Allen] was justified in anticipating an attack by [Smith], and if you further believe from the evidence that [Smith] died as a result of being shot with a firearm that was in the possession of [Allen] but that the shooting was accidental, or at a time when [Allen] was lawfully acting in his defense, then you must find [Allen] not guilty.

The trial judge refused this instruction as well.

¶23.　The judge did not abuse his discretion by refusing D-5.　As we have already stated, instruction C-21 fairly stated the applicable law regarding self-defense, and the evidence did not support any instruction on the excuse of accident.　Allen again fails to explain what

9

evidence supported this proposed instruction or why instruction C-21 was inadequate.

¶24.    Moreover, although Allen fails to address the issue, the evidence in this case did not require an instruction on "after-developed facts." Such an instruction is appropriate if there is evidence that the defendant acted in self-defense based on some "misapprehension[] or mistaken belief." *Cooper*, 230 So. 3d at 1079 (¶24). In such a case, it is appropriate to instruct the jury to judge the defendant's actions based on the "circumstances" as they "reasonably appeared to [him]"—and not "in the cool, calm light of after-developed facts." *Id.* at 1077-78 (¶¶20-23). However, such an instruction is not required for every "routine self-defense . . . claim." *Id.* at 1078-79 (¶¶23-24) (quoting *Crook v. State*, 105 So. 3d 353, 362 (¶23) (Miss. Ct. App. 2012)). In this case, Allen points to no "after-developed facts," unknown to him at the time of the killing, that would have required such an instruction. Therefore, the standard instruction (C-21) on self-defense was sufficient, and the judge did not abuse his discretion by refusing this additional instruction. *Id.* at 1079 (¶24).

## II.    Sufficiency of the Evidence[3]

¶25.    Allen argues that there was insufficient evidence to support each of his convictions. When we address a challenge to the sufficiency of the evidence, all credible evidence of guilt must be taken as true, and the State is entitled to all reasonable inferences that may be drawn

---

[3] Allen separately argues that the trial judge erred by denying his motion for a directed verdict at the conclusion of the State's case-in-chief. However, when, as in this case, the defendant presents evidence after the denial of his motion for a directed verdict, he waives his right to appeal the original denial of a directed verdict. *Pace v. State*, 242 So. 3d 107, 117 (¶¶24-25) (Miss. 2018). Allen preserved his challenge to the sufficiency of the evidence by renewing his motion for a directed verdict after the close of the evidence and by filing a post-trial motion for judgment notwithstanding the verdict. *Id.* Therefore, we address Allen's challenge to the sufficiency of the evidence based on all of the evidence presented at trial.

therefrom. *Haynes v. State*, 250 So. 3d 1241, 1244 (¶6) (Miss. 2018). We will reverse and render if the evidence is such that reasonable jurors could not have found the defendant guilty beyond a reasonable doubt. *Id.* But we must affirm the conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Shelton v. State*, 214 So. 3d 250, 256 (¶29) (Miss. 2017)).

### A. First-Degree Murder of Brandon Smith

¶26. In order to sustain a conviction for first-degree murder, the State must prove that the defendant (1) killed a human being (2) "without the authority of law" (3) "with deliberate design to effect the death of the person killed." Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014). Allen argues that the State failed to prove the second element because he acted in reasonable self-defense. "When self-defense is raised, the State bears the burden of proving beyond a reasonable doubt that the defendant was not acting in necessary self-defense." *Harris v. State*, 937 So. 2d 474, 481 (¶23) (Miss. Ct. App. 2006).

¶27. The evidence at trial showed that Allen shot Smith six times: twice in the back of the head, three times in the back, and once on his side. In addition, the evidence was clear that Smith was unarmed at the time. As discussed above, there was no real evidence to support Allen's claim of self-defense. Clearly, there was sufficient evidence to support the jury's finding that he did not act in necessary self-defense.

¶28. As to the other elements of first-degree murder, Melton testified that he saw Allen shoot Smith, and Smith died as a result. "Deliberate design" "connotes an intent to kill." *Holliman v. State*, 178 So. 3d 689, 698 (¶19) (Miss. 2015). "Deliberate design to kill a

11

person may be formed very quickly, and perhaps only moments before the act of consummating the intent." *Id.* (brackets omitted). Moreover, "[i]t is well-established that . . . deliberate design[] may be inferred from the use of a deadly weapon." *Id.* The jury could infer that Allen intended to kill Smith by shooting him six times at close range, including five times in the back or the back of the head. Accordingly, there is sufficient evidence to support Allen's conviction for first-degree murder.

### B. Aggravated Assault of Joshua Melton

¶29. Allen was indicted and convicted of aggravated assault for purposefully causing bodily injury to Melton with a deadly weapon. Miss. Code Ann. § 97-3-7(2)(a)(ii). On appeal, Allen asserts that the State failed to prove the "essential elements" of this offense, but he offers no further explanation for this argument.

¶30. As discussed above, Melton testified that Allen shot Smith and then pointed his gun at Melton. Melton turned and ran but was immediately shot in the neck. There is no evidence that anyone else fired a gun. There is sufficient evidence to support this conviction as well.

### C. Aggravated Assault of Roosevelt Holmes

¶31. Allen was indicted and convicted of aggravated assault for purposely causing serious bodily injury to Holmes under circumstances manifesting an extreme indifference to the value of human life. *Id.* § 97-3-7(2)(a)(i). Allen asserts that the evidence was insufficient to support his conviction because Holmes admitted that he did not actually see Allen shoot him—because Holmes was also shot in the back as he tried to run.

¶32. This argument is without merit. As just stated, there was no evidence that anyone but Allen fired a gun. Holmes was transported to a hospital in Memphis because of his injuries and remained in the hospital for more than a month. Holmes suffered a punctured lung and three broken ribs, and he testified that the bullet that struck him in his back remained lodged two inches from his heart and continued to cause him pain. The evidence was sufficient to convict Allen of purposefully causing serious bodily injury to Holmes.

### III. Weight of the Evidence

¶33. We review a trial judge's ruling denying a motion for a new trial for an abuse of discretion. *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). We "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 289 (¶1). We do not "assume[ ] the role of juror on appeal. We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.*

¶34. On this issue, Allen simply incorporates by reference his sufficiency-of-the-evidence arguments and asserts that the jury's verdict is also against the overwhelming weight of the evidence. This issue is also without merit. Multiple witnesses identified Allen as the shooter, and none of them were seriously impeached. Allen presented no evidence to contradict the State's case, let alone "overwhelming" evidence. Therefore, the trial judge did not abuse his discretion by denying Allen's motion for a new trial. *Lloyd v. State*, 228 So. 3d 953, 956 (¶10) (Miss. Ct. App. 2017).

13

## CONCLUSION

¶35. The State presented sufficient evidence to support Allen's convictions. In addition, the jury was properly instructed, and its verdict is consistent with the weight of the evidence.

¶36. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**