# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-01279-COA

**STYVEKKA THOMPSON A/K/A STYVEKKA S. THOMPSON A/K/A STYVEKKA KEEARA SAMONE THOMPSON A/K/A PEANUT**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/19/2020 |
| TRIAL JUDGE: | HON. GEORGE M. MITCHELL JR. |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MARK KEVIN HORAN |
| | BRADLEY DAVID DAIGNEAULT |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CANDICE LEIGH RUCKER |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/17/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## BEFORE CARLTON, P.J., LAWRENCE AND McCARTY, JJ.

### McCARTY, J., FOR THE COURT:

¶1.     A woman was accused of attacking her boyfriend's ex-wife as they drove down the road. A jury convicted her of drive-by shooting. We affirm.

## BACKGROUND

¶2.     After the divorce of Antonio Winters and Lucy Brown, a tumultuous custody dispute ensued over Winters' son. This custody dispute was largely centered around an alleged Amber alert that was issued when the child was with Winters and his girlfriend, Styvekka Thompson.

¶3.     Winters and Thompson subsequently met with the Kosciusko chief of police to ask about the Amber alert and to provide documentation of custody. The chief advised the couple he believed their custody dispute should be handled in chancery court.

¶4.     Winters' ex-wife, Lucy Brown, worked near Kosciusko Check Delay. After their visit to the police station, Winters and Thompson went to Ms. Brown's workplace. A camera captured what happened when they arrived. The video showed the couple enter the store and approach Ms. Brown. Winters immediately confronted his ex-wife stating, "I don't care what you got going on or who you call. B----, that is not your son." Thompson told Ms. Brown, "[C]atch me outside."

¶5.     As Ms. Brown walked toward the door of the business, she pushed Winters and told him to leave. Winters then hit his ex-wife twice in the face. Ms. Brown walked toward her workstation, but he followed her. The video then showed him attempting to kick her. Winters told his ex-wife, "You know I'll kill you." He then told Ms. Brown not to "call anyone about his son."

¶6.     At this point, Ms. Brown called 911. When officers arrived at the business, she told them Winters and Thompson left in an SUV—a white Tahoe.

¶7.     Ms. Brown subsequently left work. While driving, she noticed the white Tahoe. She attempted to avoid the SUV by pulling off the highway and into a subdivision. However, the SUV began following her.

¶8.     When the SUV approached the right side of her car, she saw Thompson in the driver's seat and Winters in the passenger seat. Ms. Brown later testified Winters passed Thompson

2

a gun, and Thompson fired it into Ms. Brown's car. Ms. Brown was shot in her left upper arm.

¶9. Nurse Michelle Bates' car was behind the victim's car. She immediately called 911. The nurse got out of her car and administered first aid to Ms. Brown before the ambulance arrived. She described the scene to the dispatcher as well as where Ms. Brown was shot. The 911 operator asked Bates if Ms. Brown was aware of who shot her. Ms. Brown frantically responded, "Antonio Winters and his girlfriend."

¶10. Investigators arrived on the scene, and Ms. Brown again said Winters and Thompson had shot her.

**COURSE OF PROCEEDINGS**

¶11. Thompson was indicted for one count of drive-by shooting. Prior to trial, Winters plead guilty to aggravated assault.

¶12. During the trial, Ms. Brown testified about the ongoing custody dispute with her ex-husband. She explained what happened at her workplace, and during her testimony, the video footage of Winters and Thompson attacking her was played for the jury.

¶13. The prosecution also played Ms. Brown's call to the police. The jury heard Ms. Brown ask for the police to arrest her ex-husband. She told the 911 operator that Winters "hit [her] in [her] face." The jury then heard a heated argument between Ms. Brown and Winters in the background of the 911 tape.

¶14. She also testified about the events immediately prior to the shooting. Specifically, she stated she was able to see into the white Tahoe as she was being chased. She testified

Thompson was in the driver's seat, and Winters was in the passenger seat. She saw Thompson mouth the words, "There go that B----. There go that B----," as she continued following Ms. Brown. She testified she was able to see Winters pass Thompson a gun and then fired it toward her.

¶15. Eyewitness Michelle Bates, the nurse at the scene, testified that she came to an abrupt stop when both a white Tahoe and a silver SUV pulled out in front of her. She testified, "[t]hen a fire - - a shot was fired from the white vehicle. The white vehicle sped off." She further testified that she could "only see someone in the passenger seat." But when asked about the windows of the white Tahoe, Bates stated that they were "very tinted."

¶16. During Bates' testimony, the prosecution played several 911 calls that were made on the date of the shooting. The first call the jury heard was from Bates. The jury heard her tell the 911 operator that someone in a vehicle in front of her had just pulled out a gun and shot a lady. As the witness approached Ms. Brown's car, she exclaimed, "Oh, God I see blood." When Bates asked Ms. Brown if she knew who shot her, she immediately responded, twice, "Antonio Winters and his girlfriend." The nurse then described to the dispatcher that the vehicle was a white Tahoe and described the area where Ms. Brown was shot. She stated, "It looks like the entry wound is in the left upper arm."

¶17. The jury also heard recorded calls the police made to each other while searching for the suspect. They identified Antonio Winters as the same subject from the domestic violence incident at Ms. Brown's workplace. The police knew they were searching for Winters and his girlfriend and believed her last name was Cain.

4

¶18.   Investigator Greg Collins testified regarding his investigation at the scene of the shooting. He testified that Ms. Brown told him Antonio Winters and his girlfriend had shot her. Collins also stated that Winters told him that he and Thompson left the police station and traveled to Ms. Brown's workplace in a grey Volvo. When asked if he knew about a grey Volvo being found, Collins responded, "No."

¶19.   The chief of police testified he saw Winters and Thompson get inside a white Tahoe. He testified that as they were leaving the police department, he "looked out [his] window . . . and saw them getting in a white colored . . . Tahoe-type vehicle."

¶20.   Both Winters and Thompson took the stand. Winters testified that the couple went to Ms. Brown's workplace simply to borrow money. The crux of his testimony was that after the fight with his ex-wife, he and Thompson left in separate cars. He told the jury he left in a white Tahoe, and Thompson left in a grey Volvo. He stated when he saw Ms. Brown "pull [a] gun out [the] window [he] shot first."

¶21.   Winters admitted he plead guilty to aggravated assault. When asked why he plead guilty, Winters responded, "[B]ecause I'm already a convicted felon and I'm not fixing to get a life sentence."

¶22.   Thompson also testified that she and Winters left the business in separate cars. She told the jury after leaving Check Delay that she did not see Winters again until later that night.

¶23.   On cross-examination, the State asked her if she heard the questioning that the police were seeking a woman named Cain. She responded, "My name is Styvekka Thompson."

5

The prosecution then asked if she had registered to vote, and Thompson said she had. "Did you put a middle name in there, Styvekka?" she was asked. The record showed she did not answer. The assistant district attorney then stated:

> Q.     You are under oath, Styvekka. What name did you print out on that- -
>
> A.     Styvekka Thompson.
>
> Q.     You didn't put Styvekka Cain Thompson on there[?]
>
> A.     Styvekka Thompson.
>
> Q.     Okay. All right. We'll see about that.

¶24.    The issue of her name was not over. The prosecution next called the circuit clerk as a rebuttal witness. The circuit clerk testified her office had a verified voter registration card for Thompson that listed her full name as Styvekka Keeta Cain. The State admitted this document into evidence with no objection by the defense.

¶25.    At the end of trial, the jury found Thompson guilty of one count of drive-by shooting. The trial court sentenced Thompson to serve eight years in custody and five years post-release supervision.

¶26.    Thompson appealed.

## DISCUSSION

### I.     The verdict was not against the overwhelming weight of the evidence.

¶27.    Thompson argues that the verdict in this case was against the overwhelming weight of the evidence because Ms. Brown was the only witness who placed Winters and Thompson in the Tahoe. She also argues that Ms. Brown was the only witness who testified that

6

Thompson was the shooter.

¶28.    "A challenge to the weight of the evidence is separate and distinct from a challenge to the legal sufficiency of the evidence in that it seeks a new trial." *Dehart v. State*, 290 So. 3d 373, 376 (¶16) (Miss. Ct. App. 2020). "[O]nly in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." *Green v. State*, 312 So. 3d 1214, 1217-18 (¶17) (Miss. Ct. App. 2021). Critically, "issues of weight and credibility of witness testimony are within the sole province of the jury as a fact finder." *Id*. at (¶18) (internal quotation marks omitted). "As an appellate court, we are not permitted to sit as the thirteenth juror and assume the role of juror on appeal." *Id*. (internal quotation marks omitted).

¶29.    The jury saw and heard the video of Ms. Brown's altercation with Winters and Thompson. The jury also heard Ms. Brown's 911 call in which she told the operator that the couple left her workplace in a white Tahoe. Ms. Brown testified at great length regarding the moments immediately before the shooting. Specifically, she stated she saw Thompson shoot her from the driver's seat of the white Tahoe. This dovetailed with the testimony from the Kosciusko chief of police that both Winters and Thompson left his office in the "white colored Tahoe-type vehicle."

¶30.    Notably, the jury heard Bates' 911 call in which Ms. Brown twice identified Winters' girlfriend as one of the people who had shot her. The jury also heard calls from police during their search for Winters and his girlfriend, whom the police believed was named Cain. While

7

the defendant denied knowing anyone with that name, the jury was presented with proof from her voter registration card that her maiden name was actually Cain.

¶31. Conversely, Thompson relies on her and Winters' testimony that she was not in the Tahoe during the shooting. She also relies on the nurse's testimony that she only saw one person in the driver's side of the Tahoe at the time of the shooting and could not tell whether the shooter was male or female.

¶32. It is well settled that "when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Little v. State*, 233 So. 3d 288, 292 (¶20) (Miss. 2018). Because it was for the jury to determine which version of the facts was more credible, we find that upholding the verdict would not "sanction an unconscionable injustice." *Green*, 312 So. 3d at 1217-18 (¶17).

**II. The trial court did not err by permitting the circuit clerk's testimony.**

¶33. Thompson argues the trial court erred in permitting the testimony of the circuit clerk when she remained in the courtroom throughout the trial.

¶34. We use an abuse-of-discretion standard when reviewing an alleged sequestration violation. *Johnson v. State*, 242 So. 3d 145, 163 (¶36) (Miss. Ct. App. 2017). Thompson contends that this violated Rule 615 of the Mississippi Rules of Evidence, which provides:

> At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own. But this rule does not authorize excluding: (a) a party who is a natural person; (b) an officer or employee of a party that is not a natural person designated as its representative by its attorney; or (c) a person whose presence a party shows to be essential to presenting the party's claim or defense.

8

¶35.    "The aim of imposing the rule on witnesses is twofold.  It exercises a restraint on witnesses tailoring their testimony to that of earlier witnesses and it aids in detecting testimony that is less than candid."  *Douglas v. State*, 525 So. 2d 1312, 1316 (Miss. 1988).

¶36.    Furthermore, the rule of sequestration also "applies to rebuttal witnesses as well as witnesses who have testified, or could have testified, on the case-in-chief."  *Johnson*, 242 So. 3d 145, 163 (¶36).  Nonetheless, "[a] witness's failure to comply with a sequestration order does not automatically render the witness's testimony inadmissible."  *Harris v. State*, 937 So. 2d 474, 479 (¶16) (Miss. Ct. App. 2006).  "Rather the decision to exclude a witness's testimony rests within the trial court's sound discretion."  *Id*.  "Exclusion of the testimony is a 'serious sanction,' and appropriate only where probable prejudice would result to the other party."  *Id*. "The more appropriate sanction is to allow the other party full bore cross-examination of the witness on the facts of the Rule violation."  *Id*.

¶37.    The difference in this case lies within the purpose of the circuit clerk's testimony.  The circuit clerk was called as a rebuttal witness to authenticate an exhibit.  Her testimony went no further than the verification of a voter registration card that listed the defendant's maiden name.  While the circuit clerk was not listed as a witness, it was clearly unanticipated that Thompson would deny her actual maiden name and that she had put it on her voter registration card.

¶38.    Rule 615 was invoked during this trial.  The circuit clerk was present throughout the trial.  Thompson was given a chance to object and argue why there was probable prejudice, but she chose not to.  Furthermore, Thompson's counsel declined the opportunity for the "full

bore" cross-examination we discussed in *Harris*, *supra* ¶36.

¶39. We cannot conclude reversal was warranted in this case since "[r]eversal is not justified unless there is a showing of prejudice sufficient to constitute abuse of discretion on the part of the trial judge in not ordering a mistrial or not excluding testimony." *Johnson v. State*, 242 So. 3d 145, 163 (¶36) (Miss. Ct. App. 2017).

### III. The trial court did not err by refusing proposed jury instruction.

¶40. Thompson next argues the trial court erred by refusing to give proposed jury instruction D-8, which read:

> The Court instructs the jury that under the law no juror should nor has the right to convict STYVEKKA SAMONE THOMPSON on mere suspicion regardless of how strong the suspicion may be nor simply because there may be a preponderance of the evidence against STYVEKKA SAMONE THOMPSON nor merely because there is, or may be, a reason to think that STYVEKKA SAMONE THOMPSON is guilty. The Court now instructs you, Ladies and Gentlemen of the jury, that suspicion, no matter how strong or how great or how convincing, never rises to the dignity of evidence under the law and before a jury on oath can lawfully convict, they must be convicted upon the evidence, and the evidence alone, that STYVEKKA SAMONE THOMPSON is guilty beyond a reasonable doubt.

¶41. She contends the trial court abused its discretion since she was entitled to have jury instructions given that presented her theory of the case. Thompson further contends the proposed instruction was simply trying to caution the jurors that mere suspicion is, in and of itself, insufficient to convict a defendant.

¶42. "The standard of review with regard to a trial court's decision to grant or deny a jury instruction is abuse of discretion." *McCool v. State*, 328 So. 3d 173, 189 (¶76) (Miss. Ct. App. 2021). "In its analysis, an appellate court considers all given jury instructions to

10

determine whether, when read as a whole, they 'fairly announce the law of the case and create no injustice[.]'" *Id*. (quoting *Rubenstein v. State*, 941 So. 2d 735, 784-85 (¶224) (Miss. 2006)). "If the instructions fairly state the law and do not prejudice the defendant, reversal is not warranted." *Id*. "In other words, 'if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results.'" *Id*. (quoting *Rubenstein*, 941 So. 2d at 784-85 (¶224)).

¶43.     Our Supreme Court has analyzed an issue nearly identical to the one in the present case.  In one case, a defendant was convicted of capital murder.  *Jones v. State*, 797 So. 2d 922, 923 (¶1) (Miss. 2001).  Jones argued the trial court was erroneous in refusing his proposed jury instructions.  *Id*. at 926 (¶17).  Specifically, Jones argued "that no other instruction adequately conveyed to the jury the importance of not basing their verdict on mere suspicion." *Id*.

¶44.     In response, the Court held that "[t]he trial court does not have to give cumulative instructions on 'mere suspicion' when it has sufficiently instructed the jury on the appropriate burden of proof." *Id*. at (¶18).  Further, the Court held that "'[s]uspicion' is the apprehension of something without proof or upon slight evidence." *Id*.  (quoting Black's Law Dictionary 1447 (6th ed.1990)).  In its ruling, the Court relied on the other jury instructions, which "told the jurors that they could only find Jones guilty from the evidence and explained the heavy burden of proof." *Id*.  And "[t]he instructions made it clear that if the State failed to meet that heavy burden, they must return a verdict of not guilty." *Id*.  The Court noted that "a court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere

11

in the instructions, or is without foundation in the evidence." *Id*. at 927 (¶19). In *Jones*, the Court reasoned that the record indicated other jury instructions besides the one at issue "made it clear to the jury that the burden of proof was well beyond mere suspicion." *Id.* And as a result, the trial court was within its discretion to refuse the proposed jury instruction. *Id*.

¶45. Like in *Jones*, a given jury instruction made clear that the burden of proof was beyond mere suspicion. Specifically, jury instruction C-2 explained that the burden of proof was beyond mere suspicion and that "[t]he presumption of innocence attends the defendant throughout the trial and prevails at its close unless overcome by evidence which satisfies the jury of the defendant's guilt beyond a reasonable doubt." This instruction clearly stated that before a guilty verdict could be returned, the state had to prove beyond a reasonable doubt that Thompson was guilty. Furthermore, the given jury instruction directly expressed the State's burden of proving the defendant guilty of every material element of the crime of drive-by shooting.

¶46. Because the "heavy burden of proof" was covered by jury instruction C-2, it was not an abuse of discretion to refuse Thompson's proposed jury instruction.

### IV. Thompson's trial counsel was not ineffective.

¶47. Thompson argues her trial counsel was constitutionally ineffective because he withdrew a proposed jury instruction. The jury instruction at issue contemplated that any other person may have been the shooter, while the other jury instruction named Winters as the only other possible actor.

¶48. "The Mississippi Supreme Court has 'reiterated that, generally, ineffective-assistance-

12

of-counsel claims are more appropriately brought during post conviction proceedings.'" *Williams v. State*, 228 So. 3d 949, 952 (¶12) (Miss. Ct. App. 2017) (quoting *Dartez v. State*, 177 So. 3d 420, 422-23 (¶ 18) (Miss. 2015)). "However, an ineffective-assistance-of-counsel claim can be addressed on direct appeal when (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make finding without consideration of the findings of fact of the trial judge." *Id*. The parties to this appeal stipulated the record is adequate to allow us to review this issue.

¶49. To prevail on a claim for ineffective assistance of counsel, Thompson must prove that "counsel's performance was deficient," and "the deficient performance prejudiced the defendant." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 100-01 (1955)). "Moreover, to establish a claim of ineffective assistance of counsel, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

¶50. Thompson argues her trial counsel withdrew a proposed jury instruction based on the

mistaken belief that the State's instructions were sufficient to instruct the jury of the possibility that the shooting was committed by someone other than herself. "Traditionally, trial counsel's decision regarding whether to request certain jury instructions is considered trial strategy." *Taylor v. State*, 109 So. 3d 589, 596 (¶27) (Miss. Ct. App. 2013). Neither the State nor the defense presented any evidence of an unknown third-party shooter. Instead, Thompson's defense was centered on the theory Winters was the shooter. Because this instruction was not supported by the evidence, it would have been properly refused even if it were not within the scope of trial strategy. The judge even asked during the jury instruction conference, "You want to just withdraw 23 or refuse it?"

¶51. Furthermore, Thompson has not proved any prejudice flowing from trial counsel's withdrawing the proposed jury instruction. The trial court determined the instruction was not a true statement of the law, and the concept of accomplice liability was covered in other jury instructions. Based upon the trial court's interpretation of the proposed jury instruction, the outcome of the proceedings would not have been different had Thompson's counsel not withdrawn the instruction. Therefore Thompson did not receive ineffective assistance of counsel.

## CONCLUSION

¶52. We find that the jury verdict was not against the overwhelming weight of the evidence. We also find that the trial court did not err by permitting the circuit clerk's testimony. Additionally, the trial court did not err by refusing the proposed jury instruction. Finally, we find that Thompson's trial counsel was not ineffective.

14

¶53.  **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.**